The issue in this case is whether the trial court erred in entering summary judgment for Resort Investment Corporation and the other defendants (all hereinafter referred to as "U.S. Capital," the name of the parent corporation).
The evidence before the trial court tended to show the following: In the fall of 1982, John R. Kline, who lived in Hutchinson, Kansas, contacted U.S. Capital in response to an advertisement in the Wall Street Journal advertising the Royal Gulf Beach and Racquet Club of Gulf Shores Plantation. The Royal Gulf Beach and Racquet Club was Phase II of the Gulf Shores Plantation project; it was in the pre-sale stage at that time and was not yet under construction. Mr. Kline spoke to Ann Picard, a sales agent for U.S. Capital, and he had a number of telephone conversations with Ms. Picard throughout the winter and spring of 1983. Ms. Picard sent the Klines literature about the project; none of the literature contained any reference to a golf course, nor did it refer to any guarantee of resale. During the telephone conversations prior to the Klines' purchase of a condominium, Ms. Picard told Mr. Kline that there would be a golf course at the project.
On March 15, 1983, the Klines, without ever viewing the property, signed an "Agreement of Purchase and Sale" and made an $8,000.00 down payment on a condominium in Phase II of the project. The Klines testified that they thought they were buying a unit in a project that would include a golf course, even though Mr. Kline knew that the written agreement that he had signed did not contain any reference to a golf course.
During the 17 months between the signing of the purchase agreement and the closing on August 16, 1984, the Klines received additional literature about the project and the planned Phase III. Some of this literature stated that a golf course was being negotiated but warned that no commitments could be made as to whether the course would be built or when; Mr. Kline read this literature and admitted that he understood that there was no promise or guarantee that a golf course would ever be *Page 496 
built.[1]
By letter dated August 3, 1984, the Klines requested that they be released from their agreement to purchase the condominium; they cited Mr. Kline's poor health and a change in financial conditions as the reasons why they wished to rescind the agreement. Ms. Picard contacted the Klines and convinced them to visit the project before they made a final decision. The Klines visited the project sometime around or just after August 5, 1984; they were disappointed in the project, including the lack of a golf course, and they still wanted to rescind their agreement. They informed Ms. Picard that they were interested in the unit only as an investment and that they believed that a golf course would enhance the unit's value. Ms. Picard reassured the Klines that there would be a golf course. The Klines were also concerned about their unit and its resale value; Ms. Picard told them that their unit was the last of its kind in Phase II and was more marketable than other types of units and could be easily resold by Ms. Picard. The Klines allege that U.S. Capital represented that its resale division could resell their unit at a profit; no such resale division ever existed, although the regular sales agents did handle resales. In fact, sales of the condominiums in the project had slowed a great deal in the middle of 1984.
The Klines agreed to conduct the closing by mail, and on August 16, 1984, Mr. Kline signed a copy of the "Declaration of Condominium," which did not include among its list of facilities a golf course. The Klines did not read this document. Mr. Kline also signed a mortgage, which he did not read, and a federal "Truth-in-Lending Disclosure Statement," which indicated that the mortgage would not be assumable on the original terms; Mr. Kline did not read that provision, either.
The record indicates that the Klines were not novices to the world of real estate transactions. They had owned and handled rental property, and in purchasing, renting, and selling properties, they had used a real estate agent only once and had never used an attorney, preferring to handle those matters themselves. They had invested in properties in Arizona on which they made a profit. Indeed, when the Klines purchased this condominium, they did so only for investment purposes. Mr. Kline had owned a property casualty insurance agency and was fully aware of the importance of a contract and the need to read one completely before signing it.
The Klines filed suit on August 4, 1986, and amended their complaint twice after that date. They alleged a number of misrepresentations and omissions that they claimed constituted fraud; however, on appeal, the Klines have abandoned all theories of liability except one. They argue that the defendants' representations and omissions made in August 1984, just prior to the closing, were false and that the defendants suppressed material facts.
Because this action was filed prior to June 11, 1987, the effective date of Ala. Code 1975, § 12-21-12, the "scintilla rule" is the standard for determining the propriety of the summary judgment. Under that rule, "If there is any evidence supporting the position of the party against whom the motion is made, summary judgment cannot be granted." Boswell v. Coker,519 So.2d 493, 495 (Ala. 1987).
Defendants contend that even if there were misrepresentations on their part, there was no evidence that the plaintiffs reasonably relied upon them. Of course, reasonable reliance is a necessary element of a claim for misrepresentation.Boswell, 519 So.2d at 495.
In this case, the circumstances were the sale of a condominium for a price of $79,900.00 to buyers who were experienced in real estate and contract dealings. Even if the defendants never told the Klines the difficulties involved in building the golf *Page 497 
course, the Klines were aware that there was no guarantee that it would be built, and Mr. Kline signed sales documents that did not include any reference to the building of a golf course. Indeed, Mr. Kline never read most of the documents he signed, even though he knew the importance of doing so. The "Agreement of Purchase and Sale" stated in capital letters, "ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT." That document also contained a provision allowing the purchaser 15 days in which to review the contract, other documents, and anything else the purchaser deemed important; that document provided that if the purchaser chose to do so, he could rescind the agreement within those 15 days and receive a full refund of his down payment. Mr. Kline never consulted an attorney, never investigated the Gulf Shores condominium market, never investigated the defendants and their business reputations, and did not avail himself of that 15-day rescission provision. As for the alleged promise by the defendants to quickly resell the Klines' unit, the Klines received no written agreement to that effect. Mrs. Kline admitted that she had no evidence that U.S. Capital did not try to resell the unit for them, other than the fact that it was not sold. The documents that Mr. Kline signed after the alleged misrepresentation about resale of the unit did not contain any promise or guarantee concerning the resale of the unit by U.S. Capital.
While there is some evidence that misrepresentations were made and that material facts were concealed, it is clear from these circumstances, that the Klines did not reasonably rely upon any such alleged misrepresentations or omissions. The evidence shows that the Klines did not read most of the sales documents in this transaction; that they knew it was a large real estate transaction; and that they were considering it for investment purposes. When inconsistencies between what the Klines allege that the defendants said and what the documents and literature stated became apparent to the Klines, they made no investigation into those inconsistences or into the nature of the condominium market in Gulf Shores. The Klines were not inexperienced novices to real estate investments and to the importance of contracts, yet they proceeded in the face of known inconsistencies and without reading the very documents that controlled this transaction. "If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, 'volunti non fit injuria.' " Munroe v.Pritchett, 16 Ala. 785, 789 (1849).
Also, it is clear that the two representations that the Klines dispute, that a golf course would be built and that U.S. Capital would resell the condominium, both involvefuture acts. As this Court stated in Padgett v. Hughes,535 So.2d 140, 142 (Ala. 1988):
 "The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive. See Russellville Production Credit Ass'n v. Frost, 484 So.2d [1084] at 1085-87 [(Ala. 1986)]. Furthermore, '[t]he failure to perform a promised act is not in itself evidence of intent to deceive at the time a promise is made. If it were, the mere breach of a contract would be tantamount to fraud.' Id. at 1086."
The defendants made a prima facie case showing that there was no fraud. The Klines produced no evidence that U.S. Capital did not intend to build a golf course or to resell the condominium at the time those representations were made. Mrs. Kline *Page 498 
conceded that she had no evidence that U.S. Capital did not try to resell the condominium, other than the fact that it was not sold. As to the golf course, the fact that U.S. Capital became aware of and investigated various ecological problems with the site (including the problem with the beach mouse habitat, see n. 1) tends to show that U.S. Capital was contemplating building a golf course.
For the above reasons, the summary judgment is affirmed.
AFFIRMED.
ALMON, ADAMS and STEAGALL, JJ., concur.
HORNSBY, C.J., concurs in the result.
[1] The planned location of the golf course was in the habitat of the endangered Alabama beach mouse, and thus there were numerous state and federal regulatory difficulties involved in constructing anything on that site. Apparently, the Klines were not told of this situation with the beach mouse.