771 So.2d 419 (1999)
Ex parte DIAL KENNELS OF ALABAMA, INC., d/b/a Alabama Kennels; et al.
Re Dial Kennels of Alabama, Inc., d/b/a Alabama Kennels; et al.
v.
Macon County Greyhound Park, Inc., et al.
1970873.
Supreme Court of Alabama.
December 17, 1999.
Rehearing Denied March 10, 2000.
*420 Jock M. Smith, Tuskegee; Gregory L. Davis, Montgomery; and Robert D. Segall of Copeland, Franco, Screws & Gill, Montgomery, for petitioners.
Fred D. Gray and Stanley F. Gray of Gray, Langford, Sapp, McGowan, Gray & Nathanson, Tuskegee, for respondent Macon County Greyhound Park, Inc.
Deborah Hill Biggers, Tuskegee, for respondent Macon County Racing Commission.
PER CURIAM.
Dial Kennels of Alabama, Inc., d/b/a Alabama Kennels, and others (all referred to hereinafter as "Alabama Kennels"), sued Macon County Greyhound Park, Inc., and the Macon County Racing Commission, alleging misrepresentation, suppression, and breach of contract. Alabama Kennels alleges that the defendants failed to randomly conduct the draw process for determining post positions for races at the Macon County Greyhound Park (hereinafter "Greyhound Park"). The trial court entered a summary judgment in favor of the defendants. The Court of Civil Appeals, on December 19, 1997, affirmed, without an opinion. Dial Kennels of Alabama, Inc. v. Macon County Greyhound Park, Inc., 736 So.2d 685 (Ala.Civ.App.1997) (table). We granted Alabama Kennels' petition for certiorari review. We affirm in part, reverse in part, and remand.
We must determine whether the evidence before the trial court created a genuine issue of material fact and, if not, whether the defendants were entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Ex parte Brislin, 719 So.2d 185 (Ala.1998). In determining whether a summary judgment was properly *421 entered, this Court must review the evidence in a light most favorable to the nonmoving party and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993). This action was filed after June 11, 1987; therefore, the "substantial-evidence rule" of § 12-21-12, Ala.Code 1975, applies. See Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Under the substantial-evidence rule, once the movant makes a prima facie showing that there is no genuine issue of material fact, the nonmovant must rebut that showing by presenting "substantial evidence" that creates a genuine issue of material fact. "Substantial evidence" is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala.1989).
Viewed in the light most favorable to the nonmovant, Alabama Kennels, the evidence indicates the following: In 1984, Alabama Kennels and Macon County Greyhound Park, Inc., entered into a yearly renewable "Greyhound Booking Agreement" and "Kennel Lease Agreement"; by those agreements, Alabama Kennels was to supply greyhounds for races at the Greyhound Park. The last contract between Alabama Kennels and Macon County Greyhound Park was executed in 1992. Macon County Greyhound Park did not renew Alabama Kennels' contract for the 1993 season.
The method by which the draw for post positions for races at the Greyhound Park is to be conducted is governed by the "Macon County Racing Commission Greyhound Racing Rules and Pari-Mutuel Regulations." Section 2-1420 of those rules and regulations states:
"2-1420. Prior to the first race of a performance, the Racing Secretary, under the supervision of a Commission Judge, shall draw all entries for all races and insure that the races have been filled in their entirety. Following the drawing, each entry will be assigned a post position through a random process. The completed listing of entries and post positions shall be submitted to the Commission Judge, posted in the Racing Secretary's office and the location designated to inform kennel owners and trainers. The Racing Secretary may draw post positions any time prior to the first race of any performance, provided it is no less than twenty-four (24) hours before the performance the greyhounds are to race. The time of drawing of entries and post positions shall be consistent throughout the meet. The Racing Secretary may also draw substitutions for any race card and use them as conditions necessitate."
(R.T. 631-32.) (Emphasis added.)

I. Fraud

A. Suppression
The elements of a claim of fraudulent suppression are: (1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression. Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909 (Ala.1994). A "material fact" is a fact that will induce action or inaction by the other party. Bank of Red Bay v. King, 482 So.2d 274 (Ala.1985). In this case, as in most suppression cases, whether the matter alleged to have been suppressed was a "material fact" is a question for the jury. See Liberty Nat'l Life Ins. Co. v. McAllister, 675 So.2d 1292 (Ala. 1995).
Certain evidence (to be discussed later) suggested that the process for drawing post positions might, in fact, not be conducted randomly. A duty to disclose that fact could arise from a request for information. Hines, supra. The testimony *422 of Walter Pope, Alabama Kennels' manager and kennel trainer, indicates that he expressed to employees of the Greyhound Park and to Commission officials a concern that the draw process for races at the Greyhound Park might not be conducted on a random basis. He said that, in response, James Baker, director of racing for the Greyhound Park, told him that the process was random. Pope's expression of concern is fairly to be taken as an inquiry as to whether the post positions were randomly drawn. Because one who responds to an inquiry has a duty to speak the entire truth, the evidence regarding Pope's inquiry about the draw process is sufficient to support a finding that a proper answer to that inquiry was a "material fact" insofar as Alabama Kennels was concerned. See Roberts v. C & S Sovran Credit Corp., 621 So.2d 1294 (Ala.1993). A jury could infer that the defendants had a duty to disclose the potential that the draw process was not being conducted randomly.
Arthur Nienow, the owner of Alabama Kennels, testified by deposition that had he known that the draw process would not be conducted on a random basis, he would not have entered into the lease agreement or the booking agreement with the Greyhound Park in 1991. In an affidavit, Walter Pope stated that had he known that the draw process was not random, he would not have allowed Alabama Kennels' dogs to race at the Greyhound Park. Pope stated by affidavit:
"Without a random draw process, the Macon County Greyhound Park gives an unfair advantage to certain participants in the race and really exercises control over the outcome of each race. A nonrandom draw, especially a draw which severely limited the number of one and eight boxes Alabama Kennels was receiving, caused Alabama Kennels damages.... Post positions are important in greyhound racing, as greyhounds tend to have their own personality and behavior when racing. Certain greyhounds may tend to run to the outside of the racetrack while others may prefer to run on the inside of the track. Trainers generally prefer the # 1 box and the # 8 box over the other six post positions."
(Emphasis added.)
In his deposition, Milton McGregor, president and CEO of Macon County Greyhound Park, testified as follows:
"Q: Is he [the kennel owner] told anything concerning the Macon County Racing Commission Greyhound Racing Rules and Regulations?
"A: Well, if he's any kind of kennel owner at all, he knows.
". . . .
"Q: Prior to 1993, was it the Macon County Greyhound Park's policy to follow all the rules and regulations of the Macon County Racing Commission?
"A: Yes, sir.
"Q: And was that also disclosed to kennel owners prior to 1993?
"A: Sure."
(R.T. 904, 914-15.)
The evidence presented created a genuine issue of material fact as to Alabama Kennels' claim of fraudulent suppression. Accordingly, the judgment of the Court of Civil Appeals affirming the summary judgment in favor of Macon County Greyhound Park and the Macon County Racing Commission is due to be reversed insofar as it relates to the fraudulent-suppression claim.

B. Misrepresentation
Fraudulent misrepresentation is different from fraudulent suppression. A plaintiff alleging fraudulent misrepresentation must prove that the defendant made a false statement regarding a material fact and that the plaintiff relied on it to his detriment. Reeves Cedarhurst Dev. Corp. v. First Am. Fed. Sav. & Loan Ass'n, 607 So.2d 180 (Ala.1992). A fraud claim has at its heart an alleged misrepresentation concerning a material fact, made either by an affirmative statement or act, or by a concealment or suppression of a material fact. *423 Reynolds v. Mitchell, 529 So.2d 227 (Ala. 1988).
The evidence indicates that Alabama Kennels drew 113 number 1 post positions and 127 number 8 post positions, out of a total of 2,093 draws. Those two positions are 25% of the positions available (8). Thus, during that period it drew number 1 and number 8 positions in approximately 11.5% of the draws. In 1992, Dr. Kermit Miller, a mathematician, conducted a preliminary statistical analysis of the possibility of getting 113 number 1 box draws out of 2,093 draws and 127 number 8 box draws out of the same 2,093 draws. Dr. Miller stated that "there is less than one chance in three trillion of finding a sample proportion[ ] as low as .115 when the true population portion is .25 for a sample size of 2,093." Dr. Miller concluded:
"[I]t is extremely unlikely that the draws scenario could happen by chance. The normal tests are 95% or 99% confiden[t], which means the same as 1 or 5 chances in 100 that the event would happen by chance. This result will be totally off any scale, regardless of methodology used. Hence, again, there appears to be almost no way that this could have happened by chance."
In 1995, Dr. John Jackson, an econometrist and statistical expert, was supplied a tabulation of Alabama Kennels' lane assignments of lanes 1 and 8 for March through September 1992, to determine if the lane draws had in fact been random. Dr. Jackson concluded that there was virtually no chance that the lane assignments had been randomly drawn.
The evidence raises a question of fact regarding the representation made to Walter Pope. In his affidavit, Pope stated that in 1991 or early 1992 he became concerned over the draw process and voiced his concerns to the Greyhound Park employees, the judges, the racing secretary, Racing Commission officials, and other trainers. James Baker, director of racing for Macon County Greyhound Park, testified in deposition that he would invite concerned trainers to watch the draw process, to assure that it was indeed random.
Walter Pope testified as follows:
"Q: Mr. Gray [defense counsel] asked you earlier what, if anything, did you do after you became concerned over the draw process, and I believe you indicated to us that you checked your start sheets and told Mr. Nienow. You've also indicated later in your testimony that you voiced concerns to the officials, the racing secretary, and the judges that were there in the room when you voiced those concerns; is that correct?
"A: That's absolutely correct.
"Q: And that's after you became concerned over the draw process that you voiced those concerns?
"A: Right.
"Q: Earlier you stated that Mr. Baker had said that the draw process was a fair process?
"MR. GRAY: Objection to the form. I don't believe that was the testimony that I heard.
"THE WITNESS: Yes.
"Q: Did Mr. Baker say that the draw process was a fair process?
"A: Yes.
"Q: What did you interpret the word `fair' to mean?
"MR. GRAY: Objection to the form.
"THE WITNESS: Everyone gets an even shake.
"Q: Is that the same thing as a random draw?
"MR. GRAY: Objection to the form.
"THE WITNESS: Yes.
"Q: Random being everyone gets an even shake in the way the dogs are chosen for the post positions?
"MR. GRAY: Objection to the form.

*424 "THE WITNESS: Yes."
(R.T. 759-60.)
Alabama Kennels also alleges that the Commission, through its racing rules and pari-mutuel regulations, misrepresented that the selection process was random. Arthur Nienow testified to the following:
"Q: Mr. Nienow, no one from Macon County Greyhound Park ever represented to you anything concerning the draw process; is that correct?
"A: I don't know how to answer that question, Mr. Gray. There are certain things that are self-evident. When you sign a contract with Macon County Race Track [sic] and the Racing Commission gives you a set of rules and regulations that ride with this contract, you assume that you have a random draw. You assume that there isn't going to be anything jump out of the woodwork at you of an [illicit] nature or illegal nature or anything else, that everything is going to be done in accordance with the regulations.
"So when you say about did they specifically beat you over the head and say about random draw or nonrandom draw, I can only answer you by saying that the contract is self-evident and the regulations are self-evident. They represented to me that the draw would be random, and it wasn't.
". . . .
"Q: Who represented that to you?
"A: The contract.
"Q: The contract?
"A: And the regulations.
". . . .
"Q: So you are saying based upon the contract
"A: I am saying based upon the contract and based upon the regulations that are the foundation of this contract. The two are riding hand and hand. One cannot ride without the other. You can't create a contract without creating a set of regulations that govern the entire track."
(R.T. 440-42).
Alabama Kennels argues that it relied on the conduct of Commission officials and Greyhound Park employees. Alabama Kennels' reliance on the representations made must be evaluated under the "justifiable reliance" standard.[1] To have justifiably relied upon a misrepresentation, the one claiming to have relied must have believed the representation to be true. Smith v. J.H. Berry Realty Co., 528 So.2d 314 (Ala.1988). The evidence indicates that Alabama Kennels continued to enter yearly booking agreements with the Greyhound Park, believing that the post positions were selected randomly. Alabama Kennels also presented evidence indicating that it continued to expend money caring for greyhounds. The evidence indicates it was not until 1992 that Pope became concerned with the draw process.
The representations made to Pope and the studies of Dr. Miller and Dr. Jackson create genuine issues of material fact for the jury to resolve. The evidence also would support the inference that the defendants misrepresented to Alabama Kennels that the draw process was being randomly conducted.
Accordingly, the trial court erred in entering the summary judgment in favor of Macon County Greyhound Park and the Macon County Racing Commission on Alabama Kennels' fraudulent-misrepresentation claim. As to that claim, the Court of Civil Appeals' judgment of affirmance is reversed.

*425 II. Breach of Contract

Alabama Kennels contends that the defendants failed to disclose that the drawing process was in fact not random; that the defendants represented that post positions were randomly selected; and that Macon County Greyhound Park breached its lease and booking agreements by failing to provide the random draw process required under the rules and regulations promulgated by the Racing Commission.
The Kennel Lease Agreement, which provided Alabama Kennels with kennel space at the Greyhound Park, and the Greyhound Booking Agreement, which allowed Alabama Kennels to race at the Greyhound Park, do not explicitly address the random drawing of post positions. Macon County Greyhound Park argues that because the agreements do not address the draw process, it did not breach the agreements.[2]
Furthermore, the defendants argue that Alabama Kennels was a foreign corporation; that it was engaging in intrastate activity; and that it was not authorized to do business in Alabama. Therefore, they argue, the agreements are void and unenforceable. Specifically, the defendants contend that Alabama Kennels supplied greyhounds to race at the Greyhound Park; that it leased land to use for the care of the greyhounds; and that it was required to have the kennel owner present at the Greyhound Park. Thus, they argue, Alabama Kennels was engaging in intrastate activity and, therefore, that its contract claim is barred by Alabama's "door-closing" statute, Ala.Code 1975, § 10-2A-247(a).[3]
*426 Section 10-2A-247(a) bars a foreign corporation that has not qualified to do business in Alabama from enforcing its contracts made within the State of Alabama. However, application of the statute is limited to those cases in which the action is ex contractu as opposed to ex delicto.[4]Burnett v. National Stonehenge Corp., 694 So.2d 1276, 1279 (Ala.1997). That is, the statute only bars the claims of an unqualified foreign corporation seeking to enforce rights derived directly from its contract, where the actions complained of entail the failure to perform a contractual obligation. Al Sarena Mines, Inc. v. SouthTrust Bank of Mobile, 548 So.2d 1356 (Ala.1989). Businesses engaging in interstate commerce are protected by the Commerce Clause of the United States Constitution and are immune from the effects of § 10-2A-247. Stewart Mach. & Eng'g Co. v. Checkers Drive In Restaurants of N. Am., 575 So.2d 1072, 1074 (Ala.1991). Therefore, we must look to the facts to determine whether Alabama Kennels was engaged in intrastate commerce and thus is barred from pursuing its contract claim, or was engaged in interstate commerce and thus is not so barred.
We have stated that a nonqualified foreign corporation is conducting intrastate business in Alabama when it has engaged in some activity toward establishing a continuing presence in the state, over and above merely shipping commodities between the states. See Wise v. Grumman Credit Corp., 603 So.2d 952 (Ala.1992).
"The United States Supreme Court has held that a state's forum-closing statute does not unduly burden interstate commerce when the foreign corporation has `"localized its business"' in the state and when it is not entering the state `"to contribute to or to conclude a unitary interstate transaction."'" S & H Contractors, Inc. v. A.J. Taft Coal Co., 906 F.2d 1507, 1511 (11th Cir.1990) (quoting Allenberg Cotton Co. v. Pittman, 419 U.S. 20, 32-33, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974) (quoting in turn Union Brokerage Co. v. Jensen, 322 U.S. 202, 210, 64 S.Ct. 967, 88 L.Ed. 1227 (1944)), cert. denied, 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991)). See also Ryan's Family Steak Houses, Inc. v. Regelin, 735 So.2d 454 (Ala.1999) (Cook, J., dissenting).
Alabama Kennels is a foreign corporation not qualified to conduct business in Alabama. The evidence shows that Alabama Kennels housed and bred its greyhounds on its Macon County farm and kept the resulting pups there until they were 90 days old, at which time they were sent to finishing farms in Arkansas and Texas.[5] When the pups were 15 months old, they were returned to the farm at the Greyhound Park for final schooling. Nienow testified that when the greyhounds reached age 18 months, the best remained in Macon County to race at the Greyhound Park and others were sent to race at other tracks, such as the track at Daytona Beach, Florida, or Greentrack in Greene County, Alabama. In his affidavit, Arthur Nienow stated, in pertinent part:
"Alabama Kennels' operation in Macon County housed twenty-six (26) female greyhounds owned by [Arthur Nienow], personally, and approximately ten (10) which were on contract (36 total) which were used for breeding purposes. Those female greyhounds were bred to *427 dogs all over the United States. Female greyhounds are bred where the stud greyhound resides. Therefore, it is necessary to ship or transport the female greyhounds to the stud ranch wherever it may be located.
"After the puppies are born at the Macon County Kennel, they reside there until they are ninety (90) days old. At that time, the puppies are sent to an intermediate school located in West Memphis, Arkansas. They remain at this school until fifteen (15) months old. At that ... time, the dogs are brought back to Victoryland [the Greyhound Park] for evaluation and finishing, and the kennel then either uses the dog at Victoryland and/or sends the dogs to racetracks all over the country...."
From this evidence, we conclude that Alabama Kennels "localized" its business and thus is barred by Ala.Code 1975, § 10-2A-247, from pursuing its breach-of-contract claim. A nonqualified foreign corporation is barred by that statute from enforcing its contracts made in Alabama. Because Alabama Kennels is statutorily barred from pursuing the contract claim, the evidence creates no genuine issue of material fact in regard to that claim. Therefore, the trial court properly entered the summary judgment in favor of both defendants on Alabama Kennels' breach-of-contract claim.
The judgment of the Court of Civil Appeals is affirmed to the extent it affirmed the summary judgment on the contract claim. To the extent it affirmed the summary judgment on the misrepresentation and suppression claims, it is reversed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, HOUSTON, COOK, LYONS, BROWN, and ENGLAND, JJ., concur.
SEE, J., concurs specially.
HOOPER, C.J., concurs in part and dissents in part.
SEE, Justice (concurring specially).
I concur, but write specially to address the issue of expert testimony. Dr. Miller and Dr. Jackson testified regarding the randomness of the lane assignments. Dr. Miller, a mathematician, conducted a preliminary statistical study regarding the lane draws. Based on this study, Dr. Miller concluded that "there appears to be almost no way that this could have happened by chance." Dr. Jackson, a statistical expert, also concluded that there was virtually no chance that the lane assignments were randomly drawn.
While I entertain some question as to the weight that should be given this testimony, it is not the role of this Court to substitute its weighing of the evidence for that of the jury. Rather, it will be "for the jury to determine the weight and credibility of an expert witness's testimony." Kilcrease v. John Deere Indus. Equip. Co., 663 So.2d 900, 902 (Ala.1995) (citing State v. Holloway, 293 Ala. 543, 307 So.2d 13 (1975)).
"As a general rule, the jury is not bound by an expert's testimony. This does not mean, of course, that expert testimony may be disregarded arbitrarily. However, such testimony may be disregarded when called into question by other evidence in the case or through cross-examination which lessens the weight and credibility of the testimony."
Charles W. Gamble, McElroy's Alabama Evidence, § 127.02(8) (5th ed.1996). Moreover,
"the trial judge has substantial discretion as to the questions a party is allowed to ask of an expert witness. The scope and extent of cross-examination is vested in the trial court's sound discretion, and this Court will not reverse on the basis of the trial court's rulings regarding cross-examination unless an abuse of discretion has occurred."
Ayres v. Lakeshore Community Hosp., 689 So.2d 39, 41 (Ala.1997).
*428 HOOPER, Chief Justice (concurring in part and dissenting in part).
I concur in Part II, affirming the judgment of the Court of Civil Appeals to the extent it affirmed the defendants' summary judgment with respect to the breach-of-contract claim.
As to Part I, reversing the judgment of the Court of Civil Appeals to the extent it affirmed the summary judgment for the defendants on the fraud claims, I must respectfully dissent. My question is this: How can a party that does not have standing to sue on the basis of a contract somehow have standing to sue for fraudulent suppression and misrepresentation as to the same averments in its complaint regarding the breach of contract? The right of Dial Kennels to rely upon the "Macon County Racing Commission Greyhound Racing Rules" ultimately rests upon the "Kennel Lease Agreement" and the "Greyhound Booking Agreement." Yet, based on Part II of the opinion, one must conclude that Dial Kennels does not have standing to enforce those agreements, because it is not qualified to do business in Alabama. Therefore, Dial Kennels should not be heard to complain about compliance or noncompliance with rules dealing with booking and leasing for the purpose of drawing post positions to race at the Greyhound Park.
It is true that our caselaw supports the proposition that "`actions ex delicto by non-qualified foreign corporations are not prohibited in the courts of Alabama.'" Freeman Webb Investments, Inc. v. Hale, 536 So.2d 30, 31 (Ala.1988) (quoting Shiloh Constr. Co. v. Mercury Constr. Corp., 392 So.2d 809, 813 (Ala.1980)). However, Dial Kennels' claims alleging fraudulent misrepresentation and suppression "must stand independently of the prohibited contract action." Al Sarena Mines, Inc. v. SouthTrust Bank of Mobile, 548 So.2d 1356, 1364 (Ala.1989). This Court, in order to "determine whether [Dial Kennels'] tort claims stand independently of the contract action, ... must examine their substantive averments and the nature of the relief sought." 548 So.2d at 1364.
Dial Kennels' tort claims derive directly from its contracts with Macon County Greyhound Park. The booking and leasing agreements were entered into by Dial Kennels for the purpose of racing greyhounds. In order to race greyhounds, the operator of the Greyhound Park must assign post positions. The one is part and parcel of the other. There would be no obligation to provide random post assignments unless Dial Kennels and Macon County Greyhound Park had entered into contracts providing for such assignments. The rules of the Racing Commission grow directly out of the two contracts, and the two contracts would be meaningless without rules for post assignments. Dial Kennels claims that Macon County Greyhound Park breached its contractual agreements by not following the rules for random post assignments. Therefore, its fraud claims derive directly from that breach of contract and in reality are not claims ex delicto. The fraudulent-suppression and -misrepresentation claims are barred by § 10-2A-247, Ala.Code 1975.
Therefore, I must respectfully dissent as to Part I.
NOTES
[1] In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), we held that "reasonable" reliance, rather than "justifiable" reliance, is an element of fraud, overruling Hickox v. Stover, 551 So.2d 259 (Ala.1989), and Hicks v. Globe Life & Accident Insurance Co., 584 So.2d 458 (Ala.1991). However, the "reasonable reliance standard" is to be applied prospectively from March 14, 1997, the date Parham was decided, and does not apply in this case, which was filed on February 24, 1993.
[2] The Macon County Racing Commission governs greyhound racing in Macon County. It requires that racing post positions be randomly drawn. The Greyhound Park is licensed and governed by the Commission and must follow the Commission's rules and regulations. (See depositions of Milton McGregor, Arthur Nienow, and Walter Pope.) McGregor testified by deposition to the following:

"Q: Is the Macon County Greyhound Park governed by the specific rules which govern[] randomness of the draw or cover[] how the draw is to be conducted?
"A: Well, Macon County Greyhound Park, Inc., is governed bywe follow all rules and regulations established by the Commission, whatever they are.
"Q: Whatever the rules are that are established, you follow those rules?
"A: Absolutely.
". . . .
"Q: And if the Commission, in the rules, say[s] that the draw should be random, they don't have a choice; they have to follow that rule; is that correct?
"A: Absolutely. Whatever the rule says is what we follow. Absolutely.
"Q: And Macon County Greyhound Park follows that each time?
"A: They follow the rules."
(R.T. 911-13.)
[3] Although § 10-2A-247 was repealed by Ala. Acts 1994, No. 94-245, p. 457, § 3, effective at 12:01 a.m. on January 1, 1995, and was replaced by § 10-2B-15.02(a), we conclude that § 10-2A-247 applies in this action. See Phenix City-Cobb Hosp. Auth., Inc. v. Sun Pointe Property, Inc., 689 So.2d 797, 798 (Ala. 1997) (applying § 10-2A-247 to a contract entered into before January 1, 1995). Section 10-2A-247 provided in pertinent part:

"All contracts or agreements made or entered into in this state by foreign corporations which have not obtained a certificate of authority to transact business in this state shall be held void at the action of such foreign corporation or any person claiming through or under such foreign corporation by virtue of said void contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity...."
The current statute, § 10-2B-15.02(a)(1999 Cum.Supp.), provides:
"A foreign corporation transacting business in this state without a certificate of authority or without complying with Sections 40-14-1 to 40-14-3, inclusive, 40-14-21, or 40-14-41, may not maintain a proceeding in this state without a certificate of authority [sic]. All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or any person claiming through or under the foreign corporation by virtue of the contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity."
[4] We have held that a nonqualified foreign corporation's claim or action alleging fraud is not precluded by the "door-closing" statute, reasoning that a fraud claim that alleges more than the failure to perform contractual relations is independent of a valid contract. See Freeman Webb Investments, Inc. v. Hale, 536 So.2d 30 (Ala.1988). According to Alabama Kennels, the Racing Commission and Macon County Greyhound Park officials made representations with the intent to defraud; therefore, Alabama Kennels is alleging more than a failure to perform contractual obligations. Thus, Alabama Kennels' fraud claims are not subject to Alabama's "door-closing" provisions.
[5] In his deposition, Nienow also stated that the Macon County farm was the only dog farm he had owned from 1985 until 1992.