793 So.2d 714 (2000)
US DIAGNOSTIC, INC., and Advanced Medical Imaging Center, Inc.
v.
SHELBY RADIOLOGY, P.C.
1982181.
Supreme Court of Alabama.
September 29, 2000.
Rehearing Denied April 6, 2001.
*716 Robert S.W. Given, F.A. Flowers III, and Harlan F. Winn III of Burr & Forman, L.L.P., Birmingham, for appellants.
Christopher M. Mitchell of Costangy, Brooks & Smith, L.L.C., Birmingham; and Richard Jordan and Randy Myers of Richard Jordan, Randy Myers & Ben Locklar, P.C., Montgomery, for appellee.
COOK, Justice.
US Diagnostic, Inc. ("Diagnostic"), and Advanced Medical Imaging Center, Inc. ("AMI"), appeal from a judgment entered on a jury verdict in favor of Shelby Radiology, P.C. ("Shelby"), in the amount of $1,134,013 for fraud that Shelby alleged was committed against it. We affirm.

I. The Parties
Shelby is incorporated under the laws of Alabama for the purpose of providing radiology services, and it has provided such services at various locations throughout Alabama, including Shelby Baptist Medical Center in Alabaster. It has also provided services for AMI at its outpatient diagnostic center located in Montgomery. Until October 1995, AMI was owned by Central Alabama Medical Enterprises ("CAME"), an entity based in Montgomery. Diagnostic is a "publicly traded company" that "owns over one hundred [diagnostic] imaging centers throughout the United States." Brief of Appellant, at 9.

II. The Facts as Viewed Most Favorably to Shelby[1]
The dispute in this case began after Diagnostic purchased AMI from CAME, in October 1995. At that time, Shelby had in its employ three radiologists, namely, Drs. H. Peter Jander, Daniel W. Thompson, and Michael Mead. It was regularly servicing three diagnostic facilities, namely, Shelby Medical Center, Shelby Outpatient Diagnostic Center, and AMI, and the workload had become too demanding for these three radiologists. Therefore, the *717 three doctors began considering possible solutions. Under one option, Shelby would simply discontinue providing its service to AMI. Under a second option, Shelby would hire a fourth radiologist and continue to service all three facilities. The doctors concluded, however, that the second option would be viable only if Shelby could secure from Diagnostic a contract that would be "noncancelable" for three years.
Dr. Jander first discussed these options by telephone with Dr. Robert Burke, president of Diagnostic. Then, on November 13, 1995, he addressed a letter to Dr. Burke, which stated in part:
"Please find enclosed our proposal for a service agreement between U.S. Diagnostic Laboratories, Inc. and Shelby Radiology, P.C.
". . . .
"It is our intention to add a radiologist to our group in order to be able to cover our meeting times and vacation `inhouse.' We will start the recruitment process as soon as the agreement is signed but our selection criteria are stringent and it may take until July 1996 before we can fill the position."
Included with the letter was a five-page document entitled "Radiology Services Agreement" ("RSA"). The RSA purported to be an exclusive, three-year, noncancelable contract, within the context of the parties' preceding telephone discussion. The contractual period was to begin on January 1, 1996, and end on December 31, 1998.
On January 9, 1996, Dr. Jander addressed another letter to Dr. Burke. The letter stated in part: "I have discussed our position with respect to the imaging center with my partners.... We would appreciate an expedicious [sic] answer since we plan to add a fourth radiologist if our proposal is agreeable to you."[2] (Emphasis added.)
Dr. Jander met Dr. Burke at a conference in Montgomery on February 13, 1996, and the two discussed the RSA further. At that meeting, Dr. Burke told Dr. Jander that he had misplaced the RSA and he requested another copy. Consequently, on February 20, 1996, Dr. Jander transmitted by telefax a second copy of the January 9, 1996, letter and the RSA.
In March 1996, Shelby began negotiating with Dr. John Lindsey for his possible employment as the fourth radiologist. For Dr. Lindsey, who was informed during these negotiations of the RSA, the three-year provision was a primary consideration. As a result, Dr. Jander again telephoned Dr. Burke. Regarding this conversation, Dr. Jander testified:
"Q. [By counsel for Shelby] As a result of Dr. Lindsey requiring knowledge about the 3-year contract, did you contact Dr. Burke again?
"A. [By Dr. Jander] Well, after I had sent him this last fax and I hadn't heard from him in a while and it [had come] time to make a decision for Dr. Lindsey and for us, I called Dr. Burke, and I said: `Look, we are at the end of our rope. We need to know whether our contract is acceptable to you, because if it is, we will hire Dr. Lindsey, and we will continue the services. If it's not, tell me now, and we just [w]on't hire Dr. Lindsey, and we [will] all go our merry ways.'
"Q. What was Dr. Burke's response?
"A. He said he had looked at the [RSA], he found it acceptable, and *718 he told me specifically to go ahead and hire Dr. Lindsey.
"Q. From that point on, Dr. Jander, did you have any question in your mind as to what contract you were operating under?
"A. He had agreed to this new contract so that was the contract we were working under.
"Q. As a result of those representations, what did you do in reliance on it?
"A. Well, I called Dr. Lindsey, and I told him that I had just been off the phone with Dr. Burke, and Dr. Burke had told me he had accepted the contract. Dr. Burke had also told me that there might be some minor changes, that the contract is still in the hands of the lawyers, but we shouldn't worry about it. I told Dr. Lindsey: `I am confident we have this contract, Dr. Burke gave me his word, so I have no doubt that we will have that contract.'"
(Reporter's Transcript, at 231-33.) During that conversation, Dr. Burke allegedly told Dr. Jander that he had "accepted this... 3 year contract with no termination clause"; to "go ahead and hire Dr. Lindsey"; and that "there might be minor, inconsequential modifications that might come up when it [went] through his legal department." (Reporter's Transcript, at 309.) (Emphasis added.)
Dr. Jander then told Dr. Lindsey: "I am confident we have this contract, Dr. Burke gave me his word, so I have no doubt that we will have that contract." Id. at 233. Shelby signed a contract with Dr. Lindsey on March 21, 1996. Also, Shelby increased its insurance coverage from $1 million to $3 million to comply with a requirement of AMI, and it continued to service AMI.
July 1996 passed, however, without Shelby's receiving a signed contract from Diagnostic. Consequently, Dr. Jander telephoned Dr. Burke again. Dr. Burke informed Dr. Jander that he was no longer president of Diagnostic and that Jander should contact his successor, Joseph Paul.
Dr. Jander tried a number of times to reach Mr. Paul by telephone, but without success. Therefore, on November 13, 1996, he addressed a letter to Paul, which stated in part:
"At the beginning of this year, Robert Burke and I had started formalizing the contractual relations of Shelby Radiology, P.C. with [Diagnostic]. At that time I sent Rob a contract draft....
"Rob informed me recently that he was no longer in a position to formalize our agreement and that I should contact you. Since we have added a fourth radiologist to our group based on Dr. Burke's assurances and to be in a better position to handle the workload here at [AMI], we would very much like to bring this contract to a conclusion."
Shelby did not receive a response from Paul. Instead, it received a letter dated November 19, 1996, from Timothy C. Watkins, the administrator of AMI, complaining of Shelby's performance. Subsequently, Shelby received a letter from Watkins dated January 16, 1997, purporting to terminate the relationship between Shelby and Diagnostic within 30 days.
On June 26, 1997, Shelby sued Diagnostic and AMI. Through its complaint and a subsequent amended complaint, Shelby claimed damages based on allegations of fraud and breach of contract. The defendants moved for a judgment as a matter of law ("JML") at the close of the plaintiff's case and again at the close of all the evidence. The trial court submitted the case to a jury on claims of breach of contract, promissory fraud, ordinary fraud, *719 and fraudulent suppression. The jury returned a verdict in favor of the defendants on the breach-of-contract claim.[3] However, it found in favor of Shelby on the fraud and suppression claims, awarding compensatory damages of $1,134,013. The trial court denied the defendants' postjudgment motions, and the defendants appealed from the judgment based on that verdict.
The defendants contend that the trial court erred in denying their postjudgment motions for a JML.[4] More specifically, they first contend that if Shelby has a fraud claim, it is only a claim of promissory fraud. For reasons that shall be discussed, we disagree with that contention. They also argue that Shelby failed to present substantial evidence of each element of its fraud and suppression claims. We first address the arguments as they relate to the promissory-fraud claim.

III. Promissory Fraud
In Howard v. Wolff Broadcasting Corp., 611 So.2d 307 (Ala.1992), cert. denied, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993), and cert. denied sub nom. I.M.T.C., Inc. v. N.L.R.B., 507 U.S. 1032, 113 S.Ct. 1851, 123 L.Ed.2d 474 (1993), this Court set forth the elements of promissory fraud:
"To establish a cause of action for promissory fraud, the plaintiff must prove: (1) that the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation was made with a present intent to deceive; and (5) that when the representation was made the defendant intended not to perform in accordance with it."
611 So.2d at 311. (Emphasis omitted.) See also Pinyan v. Community Bank, 644 So.2d 919, 923 (Ala.1994); Capitol Constr. Co. v. Alabama Exterior Supply, Inc., 696 So.2d 1087, 1090 (Ala.Civ.App.1997). Promissory fraud thus involves a promise to do, or to abstain from doing, an act in the future. Hillcrest Center, Inc. v. Rone, 711 So.2d 901, 904 (Ala.1997).

A. False Statement
Shelby bases its promissory-fraud claim on one statement allegedly made by Dr. Burkethat Shelby would promptly receive a written contract that contained all the important provisions that were contained in the RSA, in particular, the three-year, noncancelable provision. Of course, Dr. Burke unequivocally denies making this representation. Equally unequivocal, however, was Dr. Jander's testimony that he did make it.
Moreover, Dr. Thompson corroborated Dr. Jander's testimony. More specifically, Dr. Thompson testified that he discussed the RSA with Dr. Burke by telephone sometime before May 30, 1996. Dr. Thompson testified as follows:
"Q. [By counsel for Shelby] [D]uring that conversation you had with Dr. Burke, did you talk with him any about the 3-year contract?
"A. [By Dr. Thompson] Yes, I did. You know, we had not gotten a written contract at that time, and he and I were talking about it. I told him that we were concerned that we had not gotten a written contract. During that conversation, *720 he told me not to be concerned, that it was in the hands of the lawyers and that there were no major changes.
". . . .
"Q. That confirmed to you what Dr. Burke had told Dr. Jander?
"A. Yes. I mean, yeah, in the course of the conversation, you know, he knew what we were talking about. It was pretty clear to both of us. That made me feel more comfortable."
The jury heard substantial evidence from which it could conclude that Dr. Burke made this promise.

B. Intent to Deceive
"The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive." Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774, 776 (Ala.1998) (emphasis added). "The plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud." Id. (emphasis added).
In this case, the best evidence that Dr. Burke never intended to perform this promise came from Dr. Burke himself. He testified unequivocally that he did not take the RSA "seriously." (Reporter's Transcript, at 816-17.) He also testified that he "absolutely [did] not" intend to execute any contract with Shelby that contained a three-year, noncancelable provision. Id. at 815.
We emphasize that the issue is not whether Dr. Burke intended to execute some contract, as the defendants state it, but whether he intended to execute the RSA, or a contract that differed in no material respect therefrom. The three-year, noncancelable provision was, as Dr. Jander described it, "the key." He said, "Everything else [was] minor." Id. at 310. On that issue, therefore, the evidence is clear.
There was also substantial evidence indicating that he intended to deceive Shelby. In particular, Dr. Burke testified he did not want to lose Shelby's services and that he did intend ultimately to execute a contract for its services. Dr. Jander had, however, made it clear to Dr. Burke that if Diagnostic did not accept the RSA, with its "key" provisions, the parties would simply "go [their] merry ways."
Moreover, it was undisputed that, in March 1996 when Dr. Burke made the promise, Diagnostic had no administrator to operate AMI. This was so, because the employment of the former administrator had been terminated on February 26, 1996, and her successor did not assume his duties until May 1996. Thus, if Shelby had discontinued its services in March, Diagnostic would have had neither an administrator nor servicing radiologists. The jury could have inferred, on the basis of ordinary experience, that the defendants would be in a better bargaining position after Shelby had executed the employment contract with Dr. Lindsey, the fourth radiologist. This is especially true in light of the March telephone conversation in which Dr. Jander told Dr. Burke that, in regard to whether to hire Dr. Lindsey, Shelby was "at the end of [its] rope." Consequently, the jury had before it substantial evidence, both direct and circumstantial, indicating that the defendants intended to deceive. In short, Shelby presented evidence sufficient to defeat the defendants' motion for a JML on the promissory-fraud claim.

IV. Fraudulent Misrepresentation
To prevail on a claim of ordinary fraud, that is, fraudulent misrepresentation, a plaintiff must produce substantial *721 evidence indicating (1) that the defendant made a false representation (2) of a "material existing fact," (3) upon which the plaintiff reasonably relied (4) to his damage as a proximate result. General Motors Corp. v. Bell, 714 So.2d 268, 291 (Ala.1996); Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359, 364 (Ala.1993); Kline v. Resort Inv. Corp., 547 So.2d 495, 497 (Ala.1989); Peek v. Reserve Nat'l Ins. Co., 585 So.2d 1303, 1307 (Ala.1991).

A. False Statement of Material Existing Fact
Dr. Burke allegedly told Dr. Jander that the "key" terms of the RSA were acceptable to Diagnostic. This, Shelby contends, was the false statement of material existing fact that forms the basis of its ordinary-fraud claim. As with the promise to submit an executed document consistent with the RSA, there is ample evidence that this statement was made and that it was false. We turn our attention, therefore, to an argument raised by the defendants as to the element of reasonable reliance.

B. Reasonable Reliance
The record contains substantial evidence indicating that Shelby relied on the promise and the misrepresentation, in that it executed an employment contract with Dr. Lindsey and upgraded its insurance coverage, based on the expectation that it had a deal with Diagnostic for a three-year, noncancelable relationship. The defendants contend, however, that Shelby's reliance on Dr. Burke's misrepresentation was unreasonable as a matter of law, because, they argue, the parties had no written contract, and, they say, the parties and their lawyers knew, or reasonably should have known, that an oral, three-year service contract would violate the Statute of Frauds. See Ala.Code 1975, § 8-9-2(1). Relying on Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359, 364 (Ala. 1993), they argue that the Statute of Frauds negates the element of reliance. We agree that Wilma is applicable to this case, but not for the proposition cited by the defendants.
Wilma "involve[d] a dispute over whether the parties [had] entered into a lease of shopping center property" for the "placement of a Piggly Wiggly grocery store in the shopping center." Id. at 360. "Wilma Corporation, the proposed landlord, brought claims alleging breach of contract and fraud against the proposed tenants: Fleming Foods of Alabama, Inc., Fleming Companies, Inc., Dixieland Food Stores, Inc., and Aubrey Cochran (collectively referred to as `Fleming')." Id. At a meeting of the parties, after three years of negotiations, Cochran, who was the "director of retail development for Dixieland," signed a document entitled "`Build and Lease Agreement and Sublease Lease Information ["the lease order"], which specified the terms of [the] anticipated lease.'" Id. It was undisputed that the lease order was not intended to represent the final agreement of the parties. In conjunction with his execution of the lease order, however, Cochran allegedly declared "that the lease agreement was a `done deal.'" Id. at 361. Wilma sued Fleming, after Fleming had refused to "proceed with the lease agreement," id.; that declaration was the basis of Wilma's fraud claim.
The trial court entered a summary judgment in favor of Fleming, holding, among other things, that the breach-of-contract claim was barred by the Statute of Frauds, and that Wilma's reliance on Cochran's statement "that the lease agreement was a `done deal,'" was unjustified. Id. This Court agreed with the trial court on those points and affirmed the summary judgment. Id. at 366.
*722 That case involved a number of issues pertinent to this appeal. One issue was whether Cochran's misrepresentation gave rise to a claim of promissory fraud, or of ordinary fraud. A second issue involved the implications of the Statute of Frauds for the element of reliance.
Fleming contended that Cochran's statement was essentially a promise, which, to the extent it was actionable at all, gave rise only to a claim of promissory fraud. Wilma, however, argued that Cochran purported to represent a currently existing fact, namely, "that the parties had reached an agreement." Id. at 363. This Court agreed with Wilma. Relying on Standard Furniture Manufacturing Co. v. Reed, 572 So.2d 389 (Ala.1990), it concluded that the misrepresentation related to "a present fact, that which was to be performed in the future." 613 So.2d at 364. In other words, it determined that Wilma's claim was one of ordinarynot promissory fraud.
The Court held, however, that Wilma's reliance on Cochran's misrepresentation was unjustifiable as a matter of law. It did so, in part, on the basis of the Statute of Frauds. Over Wilma Corporation's objections, it held that the Statute of Frauds was a good defense to Wilma Corporation's breach-of-contract claim. Cochran did not have written authority to bind Fleming to the lease order. Id. at 362-63. See Hight v. Byars, 569 So.2d 387, 388 (Ala.1990) ("in order for an agent to act on a principal's behalf regarding a matter controlled by the Statute of Frauds, the agent's authority must be in writing").
Corollarily, the Court concluded that the Statute of Frauds negated the element of reliance in Wilma Corporation's fraud claim. Specifically, the Court explained:
"Because Wilma Corporation deals in property development and leasing, it either knew or should have known that the Statute of Frauds prohibits an agent from entering into a contract for the lease of land on a principal's behalf without written authority from the principal.
"In summary, Wilma Corporation participated in a commercial transaction within its usual field of activity, the acquisition and development of real property. The requirement that real estate transactions be in writing is well known in our society, particularly in the context of commercial business transactions....
"Therefore, `given the particular facts of [Wilma Corporation's] knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications,' we conclude that Wilma Corporation has not presented substantial evidence creating a genuine issue as to whether it had `justifiably relied' on the alleged misrepresentation."
613 So.2d at 366.
In this case, Dr. Burke's statement that the "key" terms of the RSA were acceptable to Diagnostic differs in no relevant respect from Cochran's misrepresentation "that the lease agreement was a `done deal.'" Thus, we agree with Shelby that it states a claim of ordinary fraud. At first glance, therefore, the defendants' reliance on Wilma for the proposition that the Statute of Frauds negates the element of reliance appears valid.
Although the Wilma Court specifically rejected Wilma Corporation's objection to Fleming's Statute of Frauds defense, in doing so it illuminated a crucial distinction between these cases. Wilma Corporation argued for the application of the "fraudulent conduct exception" to Fleming's Statute of Frauds defense. Id. at 363. The Court rejected that argument, because the fraud involved in Wilma was not "inherent fraud." Id. The Court explained:

*723 "The fraudulent conduct exception requires a showing of `inherent fraud that is, an intention not to perform operating from the inception of the transaction.'... Wilma Corporation presented no evidence that either Fleming or Cochran, at the very time when Cochran made the alleged misrepresentation, intended not to perform. Therefore, Wilma Corporation has not made the showing of fraud inherent from the inception of the transaction that is required to estop Fleming from relying on the Statute of Frauds defense."
Id. (emphasis added).
The distinction between these cases is this: Wilma did not involve promissory fraud; this one does. Wilma Corporation was not required to prove that a promise was made with the intent to deceive and without the present intent to perform. As we discussed in Part III, Shelby has made such a showing. Thus, Shelby, unlike Wilma Corporation, presented substantial evidence of "inherent fraud." In this case, therefore, the Statute of Frauds does not operate to negate the element of reliance in Shelby's fraudulent-misrepresentation claim. Cf. Trum v. Melvin Pierce Marine Coating, Inc., 562 So.2d 235 (Ala.1990) (Statute of Frauds precluded a breach-of-contract claim based on alleged breach of an oral, four-year employment contract; nevertheless, a promissory-fraud claim was viable, because the evidence indicated that the defendant never intended to keep the promise). Thus, Shelby presented evidence sufficient to overcome the defendants' motion for a JML on the fraudulent-misrepresentation claim.

V. Fraudulent Suppression
To prevail on a fraudulent-suppression claim, the plaintiff must present substantial evidence of "(1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression." Ex parte Dial Kennels of Alabama, Inc., 771 So.2d 419, 421 (Ala.1999). See also Ala. Code 1975, § 6-5-102. Shelby contends that Dr. Burke fraudulently suppressed, among other things, the facts that (1) the RSA was not acceptable to Diagnostic and (2) that Diagnostic was not taking the RSA seriously. The defendants argue that Dr. Burke had no duty to disclose these facts to Shelby. We disagree with the defendants.
"A duty to disclose [may] arise from a request for information." Ex parte Dial Kennels, 771 So.2d at 421 (emphasis added). "[O]ne who responds to an inquiry has a duty to speak the entire truth...." Id. at 422. (Emphasis added.) "[W]here one responds to an inquiry, it is his duty to impart correct information, and he is guilty of fraud if he ... gives equivocal, evasive, or misleading answers calculated to convey a false impression ..., or if he fails to disclose the whole truth." Boswell v. Coker, 519 So.2d 493, 495 (Ala.1987) (internal quotations omitted). In this case, the jury had before it ample evidence indicating that Dr. Burke was confronted with such multiple inquiriesboth from Dr. Jander and from Dr. Thompsonas to require him to disclose fully the true status of the contract negotiations and indicating that he failed to do so. Thus, the trial court properly denied the defendants' motion for a JML on the fraudulent-suppression claim.

VI. Summary
We have considered all the arguments of the defendants, and we find in them no reason to reverse the judgment of the trial *724 court. Consequently, that judgment is affirmed.
AFFIRMED.
LYONS and ENGLAND, JJ., concur.
MADDOX, HOUSTON, and BROWN, JJ., concur in the result.
HOOPER, C.J., and SEE, J., dissent.
HOOPER, Chief Justice (dissenting).
On review of a ruling on a motion for a judgment as a matter of law, this Court must review the evidence in the light most favorable to the nonmoving party; here, that was the plaintiff Shelby. Renfro v. Georgia Power Co., 604 So.2d 408 (Ala. 1992). Viewing the evidence in that manner, I see no evidence of promissory fraud that proximately caused any damage to Shelby. I see no advantage to the defendants in Dr. Burke's hiding from Dr. Jander his disagreement over the terminability of the contract. In 1996, Diagnostic found a group of radiologists who would perform the work at a less expensive rate than Shelby was charging. Diagnostic canceled the services of Shelby under the 1992 contract. Why would Dr. Burke want to keep Diagnostic in a contract that he intended to terminate anyway? Based on the plaintiff Shelby's briefs, it seems that is how Shelby wants this Court to understand the evidence in this case. This logical gap creates an irreparable break in the chain of proximate causation in this case.
What was Shelby's damage? If Shelby had in fact entered into a contract with Diagnostic that was cancelable at will without Shelby's knowledge, and had entered that contract without knowing that fact,[5] and Diagnostic had then canceled the contract, then Diagnostic's actions could have resulted in damage that might be actionable in court. However, it appears that the alleged promise from Dr. Burke to enter into a contract containing a three-year noncancelable provision was unconnected to Shelby's loss of the contract. I did not know that the courts of this State held parties to agreements that have not been made final.
Therefore, the main opinion will have unpredictable effects upon the law of contract. The opinion could possibly stand for the following dangerous propositions: If I indicate to a prospective contracting party that I will agree to something and then delay the preparation of the contract, is there potential liability if I later decide against entering into the contract? If the delay results from the fact that I want to prepare a counteroffer that contradicts what I originally "promised," am I guilty of promissory fraud? What effect will such a proposition have on the contract-negotiation process? If I say I will include a provision in a contract and on reflection decide against it, am I guilty of promissory fraud because the other party was presumptuous enough to act on a contractual provision that did not yet exist?
The problems stated above are the very reason we have written contracts. Our society does not demand that people act in a certain way until it is clear that they have agreed to so act. Such an agreement becomes clear when a signed contract exists by which a court or arbitrator can later analyze what the parties agreed to in black and white. I consider the main opinion an ingenious way for the losing party in a contract negotiation to profit from its *725 own hasty and impatient action. That principle undermines the sanctity of a contract. For these reasons, I respectfully dissent.
SEE, Justice (dissenting).
I dissent from the main opinion's affirmance of the trial court's judgment denying Diagnostic and AMI's motions for a judgment as a matter of law ("JML") on Shelby's fraudulent-misrepresentation, promissory-fraud, and fraudulent-suppression claims. Because Shelby could not have reasonably relied on Dr. Burke's representations, I would reverse the trial court's judgment and enter a judgment in favor of Diagnostic and AMI.
In affirming the trial court's judgment, the main opinion would distinguish Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993), in which this Court held that the plaintiff-landlord failed to present substantial evidence creating a genuine issue of material fact as to whether it had justifiably relied on the alleged misrepresentation of the tenant's agent that the lease was a "done deal." This Court found that the fact that the landlord knew or should have known that the lease agreement had to be in writing indicated that the landlord could not have justifiably relied upon the oral representations by the tenant's agent. The main opinion in this case concludes that, unlike the landlord in Wilma, Shelby proved promissory fraud. I disagree.
An essential element of any fraud claim is reasonable reliance. Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997). "The element of [reasonable] reliance is assessed according to the circumstances surrounding the representation...." Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359, 364 (Ala.1993). First, Dr. Burke specifically told Dr. Jander that "there might be minor, inconsequential modifications that might come up when [the contract proposed by Shelby went] through [Diagnostic's] legal department." Thus, Shelby knew that the contract was not final. Second, this was "an arm's-length transaction between two corporations whose agents knew or should have known of the requirements of the Statute of Frauds." Wilma, 613 So.2d at 366. Shelby regularly provides radiology services to numerous hospitals and was represented by counsel in this transaction; therefore, Shelby knew or should have known that an oral, three-year service contract would violate the Statute of Frauds, Ala.Code 1975 § 8-9-2(1).[6] Moreover, the evidence indicates Shelby had actual knowledge of the requirement of a writing. Dr. Jander repeatedly asked Dr. Burke and Mr. Paul about the status of Shelby's proposed contract, and he admitted at trial that he fully "[understood] the importance of signed contracts."
I conclude that Shelby could not have reasonably relied upon the alleged misrepresentation or promise by Diagnostic; therefore, I believe the trial court erred in denying the defendants' motions for a JML and in submitting the fraudulent-misrepresentation, promissory-fraud, and fraudulent-suppression claims to the jury.
NOTES
[1] "In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant[, Shelby, in this case,] and entertains such reasonable inferences from that evidence as the jury would have been free to draw." Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1037 (Ala.1999).
[2] The letter also contained two proposals for additions to the RSA regarding (1) scheduling in general, and (2) scheduling of "myelography" procedures in particular.
[3] Although there appears to be some confusion as to the jury's actual disposition of the breach-of-contract claim, for the purposes of this appeal, we will assume it was decided in favor of Diagnostic.
[4] The defendants do not argue that the amount of the verdict was excessive.
[5] With respect to a written contract, that would be impossible unless Diagnostic prepared two different contracts, one for Shelby's review that contained the three-year non-cancelable provision and one for signature that was terminable at will. Clearly, that situation would create a case of fraud.
[6] "The requirement that [long-term] transactions be in writing is well known in our society, particularly in the context of commercial business transactions." Wilma, 613 So.2d at 366.