514 So.2d 981 (1987)
R. Wayne DUKE
v.
G. Paul JONES, Jr., and Samuel M. Jones.
86-80.
Supreme Court of Alabama.
September 25, 1987.
Holly L. Wiseman, Birmingham, for appellant.
James C. Barton, Patrick M. Lavette, and Robert S. Vance, Jr., of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for appellees.
ADAMS, Justice.
This is an appeal by R. Wayne Duke from a summary judgment granted by the Circuit Court of Jefferson County in favor of G. Paul Jones, Jr., and Samuel P. Jones (the "Jones brothers") on Duke's claim of fraud and deceit. We affirm.
The facts reveal that G. Paul Jones is chairman and Samuel Jones is vice-president of Macon Prestressed Concrete, Inc. ("MPC"), a Georgia Corporation. In February 1982, the Jones brothers met with a business broker to discuss the possibility of acquiring Southeastern Porcelain and Construction Company, Inc. ("Southeastern"), an Alabama corporation involved in the construction of fast food restaurants. Duke, the principal owner of Southeastern, and James D. Hutton, a recent purchaser of a 20 percent interest in Southeastern, began discussing the sale of Southeastern to MPC following their March 1982 meeting with the Jones brothers. Negotiations between the Jones brothers and Duke and Hutton proceeded through July 1982. Southeastern's financial status and projected earnings were reported to the Jones brothers, after which MPC's offer to purchase Southeastern was summarized in a letter from G. Paul Jones to Duke. The offer called for a cash payment at closing and promissory notes for the balance of the purchase price; the notes were to be secured *982 by Southeastern's stock. MPC's board of directors approved the proposed purchase of Southeastern; however, in a July letter to the Jones brothers, Duke broke off all negotiations.
Hutton revived negotiations approximately six months later, in early 1983, whereupon Duke sought a greater price, $2,000,000.00. In the ensuing negotiations, C. Fred Daniels was retained to represent Southeastern and MPC was represented by a Macon, Georgia, attorney, Timothy K. Adams. The terms of the sale called for MPC to pay $250,000.00 cash at closing; $200,000.00 to Duke and $50,000.00 to Hutton. The balance of the $2,000,000.00 purchase price, $1,750,000.00, was represented by MPC's notes to be paid over an eight-year period. Duke was also given a long-term employment contract.
During the negotiations, Daniels wrote to G. Paul Jones and proposed the following:
Absent prior written approval of Mr. Duke and Mr. Hutton, SEPCO [Southeastern] shall not, directly or indirectly, pay to MPC any management fees or dividends, nor shall it redeem any stock, or otherwise transfer any money or other property to MPC in excess of the amounts necessary to pay the principal and interest on said notes.
Duke signed the letter to Jones, indicating that he had "reviewed and approved" Daniels's proposal. Two days later, Daniels revised the proposed terms in another letter to G. Paul Jones. That proposal provided:
Absent prior written approval of Mr. Duke and Mr. Hutton, SEPCO [Southeastern] will not, directly or indirectly, pay to MPC any management fees or dividends, nor will it redeem any stock, or otherwise transfer any money or other property to MPC in excess of the amounts necessary to pay the principal and interest on said notes. The provision will not restrict the ability of SEPCO [Southeastern] to join with MPC and affiliates thereof in making joint investments, such as the placement of assets in a cash management program.
Again, Duke signed the letter, indicating he had "reviewed and approved" it.
The Jones brothers point out that in a letter to MPC's attorney, Adams, on April 8, 1983, Daniels proposed the following:
10. Certain Conditions. So long as any principal of or interest on the Duke Note or the Hutton Note shall be unpaid, and so long as MPC shall have any obligation, fixed or conditional, to make payments of principal or interest on the Duke Note or the Hutton Note, MPC agrees as follows:
(a) Covenants.
. . . .
(vii) Until both the Duke Note and the Hutton Note have been paid in full, MPC will not permit SEPCO [Southeastern] to pay dividends to MPC except that SEPCO [Southeastern] may pay dividends to MPC from time to time in amounts equal to installments due contemporaneously therewith, or previously paid, on the Duke Note and/or the Hutton Note.
Duke was sent a copy of this letter, and the same terms were incorporated into the purchase agreement signed April 29, 1983.
Payments on MPC's notes to Duke and Hutton were paid by Southeastern dividends, paid through MPC, a practice approved by Southeastern's board of directors at their December 9, 1983, meeting. The dividends paid by SEPCO, Inc., were amounts necessary to pay Duke and Hutton as required by the promissory notes. Continuation of this policy through 1984 was approved by the Southeastern board and, as the appellees note, the following resolution was adopted:
[N]o dividends shall be paid in excess of the amounts necessary for Macon Prestressed Concrete Company to pay the interest and principal payments as they come due pursuant to the promissory notes dated April 27, 1983, payable by Macon Prestressed Concrete Company to R. Wayne Duke and James D. Hutton....
Hutton, secretary for Southeastern, signed the minutes of the December 9, 1983, meeting, *983 and Duke, as agent for Southeastern, was a witness to the signing.
Contrary to projections of Southeastern's earnings, the company began losing money following its purchase by MPC, and by August 1984 Southeastern had lost approximately $1.4 million dollars. Southeastern obtained a $1 million line of credit from AmSouth Bank, which was guaranteed by MPC and its parent company, Cornell-Young Company, Inc., also a Macon, Georgia, corporation. Duke points out that "MPC then restructured its debts at the Trust Company of Georgia, converting short-term debt to long-term debt to improve the working capital ratio of the companies." Southeastern's declining financial condition complicated MPC's ability to meet its obligations. Duke agreed to defer until after July 11, 1984, the interest payment due him from MPC in January 1984. In April 1984, MPC failed to pay Duke the first principal payment of $150,000.00
G. Paul Jones wrote to Duke on June 11, 1984, and asked Duke to defer the 1984 and 1985 principal payments of $150,000.00 each until 1992 and 1993. Duke refused Jones's request. On July 17, Jones reiterated the financial necessity of deferring principal payments. Jones said that Southeastern's financial decline not only made it difficult for Southeastern to obtain bonding and get new jobs, but had also made it impossible for MPC, as guarantor of Southeastern's debt, to meet its obligations to Duke and Hutton. The July 17 letter detailed MPC's efforts to restructure debt and to regain financial stability. Jones again recommended that Duke agree to defer annual payments of principal for 1984 and 1985 until 1992 and 1993, and said that MPC would probably be forced to file for Chapter 11 reorganization if Duke did not defer payment.
Duke filed suit on August 24, 1984, and demanded foreclosure of the pledge of Southeastern's stock, which was the security for MPC's notes to Duke and Hutton. He also asked for damages from MPC and G. Paul Jones, Jr. MPC then filed for Chapter 11 reorganization and Duke's suit against MPC and G. Paul Jones, Jr., was stayed. Southeastern filed suit against Duke and Jack's Food Systems, Inc., claiming that Duke and Jacks had conspired to destroy Southeastern's business by withholding payments due Southeastern from Jacks, an allegation the defendants denied. Duke then filed this third-party suit against the Jones brothers, MPC, and other MPC directors, alleging fraud. The trial court dismissed the action against six of the directors for lack of in personam jurisdiction; that dismissal was a judgment reversed by this Court on October 3, 1986, Duke v. Young, 496 So.2d 37 (Ala.1986).
The issues presented are:
1. Whether the trial court erred in granting summary judgment on Duke's claim that MPC's directors had willfully concealed facts regarding the method for paying promissory notes in order to induce Duke to sell his interest in Southeastern.
2. Whether the trial court erred in granting summary judgment on Duke's claim that MPC directors had fraudulently deceived him by not disclosing the source of funds from which promissory notes would be paid.
The essence of Duke's appeal is that the Jones brothers and the other directors of MPC fraudulently conspired to conceal from Duke that payments on the promissory notes given to Duke and Hutton would be made exclusively from Southeastern's earnings as paid through MPC. Duke cites, at length, the deposition testimony of Daniels, the attorney who represented Duke and Hutton in the sale of Southeastern to MPC. Daniels testified that the obligation of MPC to pay on its notes to Duke and Hutton was never restricted exclusively to the proceeds derived from Southeastern. In fact, Daniels said that if such a restriction had been communicated to him, he would have advised Duke and Hutton not to sell the capital stock of Southeastern.
Duke claims that the July 17, 1984, memorandum from G. Paul Jones was the first suggestion he had that MPC intended to pay on its promissory notes to Duke and Hutton only from profits generated by *984 Southeastern. The July 17 memorandum provides in part:
2. Regarding my request to defer both the principal payments due in 1984 and 1985 and the interest payments due in 1984, under the purchase agreement, the following facts should be considered.
a. The acquisition of SPC [Southeastern] by MPC on April 29, 1983 was highly leveraged from the beginning. There was very little cash paid at closing and it was intended that the profits projected for SPC [Southeastern] would be used to make the payments to the former owners through dividends paid by SPC [Southeastern] to MPC.
The same memorandum also stated what steps MPC was taking to improve collections and to otherwise compensate for Southeastern's sharp decline following its purchase from Duke and Hutton. Duke argues that two other members of MPC's board confirmed that the board intended that Southeastern's dividends would be used to pay on the promissory notes and that this confirmation is further evidence of fraudulent concealment. We find no evidence of fraud here.
Nowhere in the July 17, 1984, memorandum from G. Paul Jones to Duke, or anywhere else, do we find evidence that unless Southeastern's profits were sufficient to make payments on the notes, MPC intended not to honor its obligations to Duke and Hutton. The promissory notes represent the unconditional obligation of MPC to pay the debt created by the purchase of Southeastern.
The July 17 memorandum did advise Duke that MPC could not meet its 1984 and 1985 obligations on the notes and asked for a deferral of these payments. The facts indicate that Southeastern's dismal performance, plus the unprofitability of the other MPC companies, in 1983, combined to severely burden MPC's ability to meet its obligations. The July 17 memorandum did nothing more than restate what Duke already knew: that dividends paid by Southeastern to MPC could or would be used to meet MPC's obligation to pay on the promissory notes.
In the presale negotiations, Duke "reviewed and approved" the reference which became part of the contract, i.e., that Southeastern would not transfer money or property to MPC "in excess of the amounts necessary to pay the principal and interest on said notes." Duke cannot argue persuasively that he was unaware that MPC intended to use profits from Southeastern to pay on the notes. No evidence exists to support the allegation that MPC ever sought to avoid its obligations to Duke and Hutton. MPC's plan to use Southeastern's dividend payments to pay the notes might, in retrospect, be considered an unfortunate business decision, but there is no evidence that Duke was unaware of MPC's intent.
As appellee has argued, the sale of Southeastern to MPC was a transaction conducted over a period of months between experienced businessmen who dealt with one another in arm's-length negotiations. Assuming, arguendo, that MPC had not disclosed its intention to pay the notes from Southeastern's dividends, MPC, would nevertheless, have had no duty to disclose to Duke or Hutton its payment plan. Ala. Code (1975), § 6-5-102, provides:
Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.
Duke concedes that no confidential relationship existed between the parties. We find no "particular circumstances of the case" that would have required disclosure. In Trio Broadcasters, Inc. v. Ward, 495 So.2d 621 (Ala.1986), we said that the phrase "particular circumstances" in § 6-5-102, supra, "necessarily requires a case by case consideration of several factors." Id., at 624. In Trio Broadcasters, Justice Houston quoted from Jim Short Ford Sales, Inc. v. Washington, 384 So.2d 83 (Ala.1980):
A duty to speak depends upon the relation of the parties, the value [materiality] of the particular fact, the relative knowledge *985 of the parties, and other circumstances. Hall Motor Co. v. Furman, 285 Ala. 499, 234 So.2d 37 (1970).... Thus, each case must be individually examined to determine whether a duty of disclosure exists; a rigid approach is impossible, and, indeed, the words of the statute itself counsel flexibility.
Id. at 86-87. We held:
Before an obligation to disclose can be imposed under the "particular circumstances" of a case, the relationship existing between the parties, while not necessarily required to be confidential, must nonetheless be such that a disclosure of material information is dictated.
Trio Broadcasters, supra, at 624. Here, as in Trio Broadcasters, nothing about the business transaction between Southeastern and MPC suggests unequal bargaining power or anything out of the ordinary. Both parties were free to investigate and were apparently well acquainted with the world of business. Assuming, then, that even if Duke was not aware of MPC's intention to make payments on the notes from Southeastern's dividends, we find no duty on the part of MPC to disclose such an intention. We held, in Trio Broadcasters, supra
Considering the relative knowledge of the parties, our cases recognize that an obligation to disclose does not arise where the parties to a transaction are knowledgeable and capable of handling their affairs.
Id., at 624. See Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550 (1945); Collier v. Brown, 285 Ala. 40, 228 So.2d 800 (1969); Marshall v. Crocker, 387 So.2d 176 (Ala.1980); Cooper & Co. v. Bryant, 440 So.2d 1016 (Ala. 1983). In any event, Duke's allegation of willful misrepresentation is not supported by the facts of this case. Duke and Hutton knew that Southeastern's profits could or would be the source of funds MPC could use to make payments on the notes. MPC's inability to make the note payments as scheduled does not prove willful misrepresentation. The unconditional obligation to pay Duke and Hutton was manifested by MPC in the promissory notes. That absolute obligation of MPC belies Duke's allegation that MPC willfully misrepresented that the notes would be paid only from Southeastern's profits. Clearly, MPC intended to use Southeastern's profits to pay the notes, but MPC absolutely promised to pay Duke and Hutton; such is the nature of a promissory note. We have held that an intent to deceivepresent at the time the promise of future performance was mademust be shown in order to recover for fraud. We have held, further:
If such intent is not substantiated by the evidence, the fraud claim should not be submitted to the jury. The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made. It it were, a mere breach of contract would be tantamount to fraud. Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976).
Purcell v. Spriggs Enterprises, Inc., 431 So.2d 515, at 519 (Ala.1983). See Dobbins v. Dicus Oil Co., 495 So.2d 587 (Ala.1986).
In the present case, MPC apparently relied upon projected earnings of Southeastern and determined that Southeastern's profits would be more than sufficient for MPC to meet its obligation to pay Duke and Hutton. In fact, Southeastern's consistent decline was more than MPC could financially manage and, at the same time, continue to pay on its notes to Duke and Hutton. The evidence presented shows clearly that Duke was aware that profits generated by Southeastern would or could be used as the source from which MPC would pay on the notes. MPC apparently relied on Southeastern's projected success in order to make payments to Duke and Hutton; however, no evidence exists to show that MPC ever considered that its obligation to repay the notes was anything but unconditional. MPC asked Duke to defer the 1984 and 1985 payments in order to allow MPC to regain financial stability, not to disavow its absolute obligation to pay the notes. MPC's reliance on Southeastern's profitability as the principal means of repaying its obligation to Duke and Hutton, although perhaps unwise, was *986 neither an unusual nor a fraudulent practice.
Duke also claims that the facts support his allegation that the directors of MPC intentionally concealed a material fact and deceived him. As we have said, supra, the parties in this case were knowledgeable businessmen who dealt with one another at arm's-length and had equal ability to inquire into the business affairs of the other. Duke's allegation of deceit is without merit. The fact that MPC did not volunteer its intention to rely principally upon profits from Southeastern to make payments on the notes to Duke and Hutton is not fraud or deceit.
Ala.Code (1975), § 6-5-103 provides, in part:
Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.
The facts in this case do not support Duke's allegation that a material fact, i.e., MPC's intentions as to method of repayment, was concealed.
We hold that there is no evidence to support appellant's allegations of fraud and deceit. The Circuit Court of Jefferson County did not err in granting summary judgment in favor of appellees. Therefore, the judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, HOUSTON and STEAGALL, JJ., concur.
BEATTY, J., dissents.
BEATTY, Justice (dissenting).
I disagree with the majority's opinion for two reasons. First of all, although in his complaint plaintiff stated a claim for suppression squarely under Code of 1975, § 6-5-102, in his reply brief plaintiff states that his "claim is for intentional fraud, active concealment." In their brief, the defendants argue that there is no confidential relationship between the parties and that the particular circumstances of this case do not give rise to a duty on the part of the defendants to disclose. In his reply brief, however, the plaintiff responds to the defendants' lack-of-duty argument this way:
"The brief of appellees argue[s] they were under no duty to disclose to Duke their plan to limit payments on the note to the profits of Southeastern. Appellees contend there was no confidential relationship or special circumstances that imposed upon them [a duty] to tell the whole truth as to how Duke would be paid. That argument disregards the fact that Duke's claim is for intentional fraud, active concealment.

"This Court held in Berkel & Company Contractors, Inc. v. Providence Hospital, 454 So.2d 496, 505 (Ala.1984), on a claim for suppression of a material fact in violation of ALA. CODE § 6-5-102 (1975), that `mere silence is not fraud unless confidential relations or special circumstances exist; active concealment or misrepresentation must be present.' Duke claims active concealment. Appellees' argument at pages 11 to 18 in their brief is misplaced in that it concerns an aspect of fraud law not present on this appeal. Duke claims intentional fraud." (Emphasis added.)
Thus, it appears that the gravamen of plaintiff's claim is that of active concealment and intentional misrepresentation, thereby obviating the requirement that plaintiff establish a duty to disclose arising out of the relationship of the parties or the particular circumstances of the case, but nevertheless requiring plaintiff to adduce evidence of an intent to deceive. The majority, however, embraces the defendants' argument that no duty to disclose is present in this case, and, on that basis, as well as on its view that there is no evidence of fraud here, affirms summary judgment *987 as to both the § 6-5-102 suppression claim and plaintiff's claim for willful misrepresentation and deceit under § 6-5-103. Because the duty-to-disclose analysis is misplaced in this case, the majority's reliance on that principle as a basis for affirming summary judgment is erroneous.
I also disagree with the majority's assessment of the evidence in this case. The plaintiff clearly met his burden of establishing a scintilla of evidence of an intent to deceive on the part of the defendants. For that reason, I would reverse the summary judgment in favor of the defendants.
The gist of plaintiff's claim for willful misrepresentation is that, as an inducement to sell his business (Southeastern) to MPC and accept MPC's payment terms, the defendants, as directors of MPC, represented that the MPC note for $1,550,000 would be paid to the plaintiff by MPC according to its terms. Plaintiff claims that this representation constituted a willful misrepresentation because, at the time it was made, these defendants, along with the other directors of MPC (apparently also defendants), knew that they did not intend to pay the note according to its terms; rather it was their intention from the beginning to pay the installments due the plaintiff exclusively from Southeastern's earnings paid to MPC as dividends. In other words, the plaintiff claims that the defendants did not intend to pay from other MPC revenue sources the installments due plaintiff in the event Southeastern failed to generate dividends in an amount sufficient to meet those installments.
The plaintiff relies on the July 17 memorandum, the relevant portions of which are quoted in the majority opinion, as constituting at least a scintilla of evidence of the defendants' willful misrepresentation. The majority nevertheless "finds" that "[t]he July 17 memorandum did nothing more than restate what Duke already knew: that dividends paid by Southeastern to MPC could or would be used to meet MPC's obligation to pay on the promissory notes." The majority further finds "no evidence that Duke was unaware of MPC's intent." However, in opposition to defendants' motion for summary judgment, plaintiff adduced evidence establishing that, while he was aware that some or even all of the Southeastern dividends would be used by MPC to pay the installments due on the note, he did not know when he made the sale that the defendants intended to restrict payment of the note solely to the dividends MPC earned from Southeastern. Stated differently, plaintiff established that he did not know that his getting paid turned on whether the company he sold to MPC generated dividends sufficient to meet the installments due him. Plaintiff further established that he relied on the defendants' misrepresentations, and that had he known of the intended restriction, he would not have sold his shares on such payment terms. Thus, genuine issues of material fact exist as to plaintiff's claim for misrepresentation, and therefore, I would hold summary judgment was improper.