797 So.2d 457 (2001)
Ex parte LIBERTY NATIONAL LIFE INSURANCE COMPANY.
(Re Liberty National Life Insurance Company v. Gertrude White).
1982146.
Supreme Court of Alabama.
April 13, 2001.
*460 William J. Donald and Laurie K. Pratt-Johns of Donald, Randall, Donald & Tipton, Tuscaloosa, for petitioner.
Ronald O. Gaiser, Jr., and Rhonda Marie of Gaiser & Associates, P.C., Birmingam; and J.L. Chestnut, Jr., of Chestnut, Sanders, Sanders & Pettaway, Selma, for respondent.
JOHNSTONE, Justice.
Gertrude White sued Liberty National Life Insurance Company for fraudulent misrepresentation and fraudulent suppression and claimed compensatory and punitive damages. Subsequently, by amendment, White's brother Joseph Cunningham was added as a party plaintiff. The trial court conducted a jury trial.
At the close of the plaintiffs' evidence, Liberty National moved for a judgment as a matter of law. The trial court granted Liberty National a judgment as a matter of law on Cunningham's claim and on White's fraudulent misrepresentation claim but not on her fraudulent suppression claim. Liberty National did not present any evidence in its defense, and the trial court submitted White's fraudulent suppression claim to the jury. The jury returned a verdict of $1,350 in compensatory damages and $200,000 in punitive damages in favor of White and against Liberty National. Liberty National moved for a judgment as a matter of law or, in the alternative, for a remittitur or a new trial. The trial court denied Liberty National's motion for a judgment as a matter of law or for a new trial but entered an order granting Liberty National's motion for a remittitur and remitting the punitive damage award from $200,000 to $150,000:
"On August 19, 1998, the Court heard arguments of counsel in regard to [Liberty National's] motions for judgments as a matter of law, remittitur and new trial. The parties provided the Court with a transcript of the trial. The Court has carefully reviewed all of the submissions.
"[Liberty National] contends that it should have a judgment as a matter of law because (1) [White] failed to carry her burden of proof; (2) the verdict was against the great weight of the evidence and (3) the jury's damages award was excessive. It argues, [in] the alternative, that the Court should grant a remittitur or, in the further alternative, that it should grant a new trial.
"This case was tried and submitted to the jury on the issue of suppression. At the close of [White's] case, [Liberty National] moved for a judgment as a matter of law on the issues of misrepresentation, suppression and a claim on behalf of Joseph Cunningham. [White] agreed that there was no evidence to support a finding of misrepresentation and the misrepresentation claim was dismissed. The Court also found that there was no evidence to support a claim by Joseph Cunningham, and that count was dismissed.
"The Court observed the parties and their attorneys during the trial of this case. [Liberty National's] contention that [White's] verdict was contrary to the weight of the evidence and that [White] did not sustain her burden of proof is due to be denied.

*461 "In considering the issue of excessiveness this Court is bound by the standards announced in the cases of Gore v. BMW of North America, Inc., 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). The Court will address the factors which [Liberty National] addressed at the post-trial hearing.
"First, [Liberty National] argues that the award of compensatory damages in the amount of $1,350 was excessive in that it was not supported by the evidence. The amount of the award itself is evidence of the attention given by the jury to the evidence and to the Court's charge. The compensatory damages are not excessive.
"The Court has considered the degree of reprehensibility of [Liberty National's] conduct. The jury found from the evidence that Liberty National suppressed from [White] information [which, if she had had it,] she would not have bought the 1993 policy. Liberty National is a sophisticated company with knowledgeable agents. On the other hand, [White] is not sophisticated in business transactions. She was induced by [Liberty National's] suppression and purchased the policy. [Liberty National's] conduct was reprehensible in its dealing with [White] and warranted the imposition of punitive damages.
"There are no legislative fines or penalties that could be levied against Liberty National for the conduct complained of by [White] that the court considers appropriate. The court has considered the ratio of punitive damages to compensatory damages, and does find the punitive damages to bear a reasonable relationship, given the facts in this case.
"After a review of the record of the trial, as well as the arguments presented at the August 19, 1998, hearing, the Court finds that the $200,000 punitive damages award should be reduced by $50,000. The Court hereby orders remittitur of the punitive damages award from $200,000 to $150,000. The compensatory damages award will remain at $1,350."
Liberty National appealed to this Court, which transferred the appeal to the Court of Civil Appeals pursuant to § 12-2-7, Ala. Code 1975.
On appeal, Liberty National argued:
"(1) that White did not carry her burden of proof and, therefore, that the court erred in not granting Liberty National a [judgment as a matter of law] on the [fraudulent suppression] count; (2) that the compensatory- and punitive-damages awards were excessive; and (3) that the evidence did not support the jury's verdict and Liberty National, therefore, is entitled to a new trial."
Liberty Nat'l Life Ins. Co. v. White, 797 So.2d 452, 453 (Ala.Civ.App.1999). The Court of Civil Appeals held that the trial court "correctly submitted the fraudulent-suppression claim to the jury"; that "the award of $1,350 in compensatory damages [is not] ... excessive"; and "[b]ased on the extensive findings of the trial court,... the [trial] court correctly considered the guideposts of BMW [of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996),] and the other factors articulated in Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala. 1986),] and Green Oil Co. [v. Hornsby, 539 So.2d 218 (Ala.1989)]. Therefore [it saw] no error in regard to the trial court's award of damages." White, 797 So.2d at 454-57.
Liberty National petitioned this Court for certiorari review, which this Court *462 granted. The petition for certiorari review claims these errors:
"I. The Court of Civil Appeals' opinion is in conflict with cases decided by this Court and by the Court of Civil Appeals on the issue of what qualifies as a suppression.
"II. The Court of Civil Appeals' opinion is in conflict with cases decided by this Court and by the Court of Civil Appeals on the issue of duty to disclose.
"III. The Court of Civil Appeals' opinion is in conflict with the cases decided by this Court and by the Court of Civil Appeals on the issue of justifiable reliance.
"IV. The Court of Civil Appeals' opinion is in conflict with cases decided by this Court and by the Court of Civil Appeals on the issue of proper compensatory damages.
"V. The Court of Civil Appeals' opinion is in conflict with cases decided by the United States Supreme Court, this Court and by the Court of Civil Appeals on the issue of excessiveness of punitive damages."
Petition, pp. 4, 7, 8, 10, and 12. However, Liberty National did not raise before the Court of Civil Appeals the issue of "justifiable reliance." "[D]ecisions of the courts of appeals may be reviewed by the Supreme Court upon petition for writ of certiorari only after a court of appeals has overruled an application for rehearing directed to the point, issue, or decision complained of." Rule 39(a), Ala.R.App.P., as it read before the amendment effective August 1, 2000 (emphasis added). Therefore, this Court will not review the issue of justifiable reliance. The issue of a "duty to disclose" is an element of fraudulent suppression. Therefore, our analysis of the "duty to disclose" will be included in our analysis of the issue of fraudulent suppression.
"On certiorari review, this Court accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals." Ex parte Toyota Motor Corp., 684 So.2d 132, 135 (Ala.1996). "In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party...." Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala.1999). See also Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala.1992), and Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992). A presumption of correctness attaches to a jury verdict, "if the verdict passes the `sufficiency test' presented by motions for a directed verdict and a JNOV." S & W Properties, Inc. v. American Motorists Ins. Co., 668 So.2d 529, 534 (Ala.1995). (Rule 50(a), Ala.R.Civ.P., now designates a motion for a directed verdict as a motion for a judgment as a matter of law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.) This presumption is strengthened by a trial court's denial of a motion for a new trial. Christiansen v. Hall, 567 So.2d 1338 (Ala.1990). "This Court will not, on a sufficiency of the evidence basis, reverse a judgment based on a jury verdict unless the evidence, when viewed in a light most favorable to the [verdict-winner], shows that the verdict was `plainly and palpably wrong and unjust.'" S & W Properties, 668 So.2d at 534 (quoting Christiansen, 567 So.2d at 1341). "Whether to grant or deny a motion for new trial rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court's ruling constituted an abuse of that discretion." Colbert County-Northwest Alabama Healthcare Auth. v. Nix, 678 So.2d 719, *463 722 (Ala.1995). "Without a showing of such an abuse, the trial court's ruling must be affirmed." Id.
The record reveals the following facts. In 1989, White purchased a Liberty National life insurance policy insuring her own life. White paid her premiums to a Liberty National "home service" agent, who collected the premiums from White at her home. In the same year, White's disabled brother Joseph Cunningham came to live with her and her family. White and her brother discussed White's purchasing insurance to cover the expenses of a funeral for Cunningham, if anything should happen to him. They agreed that the premiums would be paid out of Cunningham's monthly Social Security benefits. Sometime, thereafter, White met with another Liberty National "home service" agent, who sold her a whole life insurance policy insuring Cunningham's life. Liberty National issued the policy on January 1, 1990. White paid the monthly premiums to the Liberty National home service agent. However, when the agent ceased collecting the premiums from White at her home, White stopped paying the premiums. White allowed the whole life policy insuring Cunningham's life to lapse on June 1, 1990.
A few months later, another Liberty National home service agent visited White at her home. The agent sold White an ALX policy, also called modified benefit life insurance policy, with a face-value of $2,500, insuring the life of Cunningham. An ALX policy pays the full face-value benefit during the first three years of the policy only if the applicant dies from an accidental cause. The policy will not pay the full face-value benefit if the applicant dies of natural causes before the expiration of those first three years, but will pay only the sum of premiums then paid plus 10% for death from natural causes during the initial three-year period. Liberty National issued the ALX policy on October 10, 1990. Apparently, White allowed this ALX policy to lapse.
In April 1991, another Liberty National home service agent visited White at her home and sold her another $2,500 face-value ALX policy insuring Cunningham's life. Liberty National issued the second $2,500 face-value ALX policy on April 1, 1991. White paid $19.07 monthly premiums on this policy until May 1993, when the Liberty National home service agent ceased collecting the premiums from White at her home. White testified that in July or August 1993, Bill Walton, a Liberty National home service agent, came to her home. She stated that Walton told her that "if I would take the [new $2,500 face-value ALX] policy that I wouldn't be behind if I would take it, so I took the policy." Walton also told White that the new ALX policy would provide the same coverage as the 1991 ALX policy. White testified that Walton did not tell her that she had the option of reinstating the 1991 ALX policy by paying the overdue and current premiums, which totaled approximately $76; that Walton did not tell her that, after reinstatement, the 1991 ALX policy would have provided the full face-value benefit in just 11 more months; and that Walton did not tell her that the 1993 ALX policy would not pay the full face-value for death from natural causes until 1996.
In September 1993, through the mail, White received a $1,000 face-value ALX policy, which Liberty National had purportedly issued on May 1, 1993, the same date that Liberty National had purportedly issued the $2,500 face-value ALX policy. After receiving the $1,000 ALX policy, White telephoned Walton and asked him why she had received the $1,000 face-value ALX policy. White testified that Walton *464 told her "that the head of Liberty National was sending me another policy." White stated that she was not aware that she was paying $8.80 per month for the $1,000 face-value ALX policy. She denied ever seeing or authorizing any typewritten applications for either the $2,500 ALX policy or the $1,000 ALX policy. However, after White sued Liberty National, Liberty National produced typewritten applications purporting to bear the signatures of White and Cunningham. Although White did not meet with Walton until August 1993, Liberty National backdated the issuance date of the policies to May 1, 1993, the month when White stopped paying the premium on the 1991 ALX policy, and backcharged White premiums on the 1993 policies beginning in May 1993. White paid the premiums on the two 1993 ALX policies until June or July 1996.
White testified that, although she graduated from high school, she reads at a fourth-grade level. She stated that she did not understand the language of the ALX policies she had received in the mail and that she did not understand that the ALX policies would not pay the full face-values of the policies for death from natural causes until the passage of three years. White testified that she would not have purchased the 1993 $2,500 face-value ALX policy if she had known she could reinstate the 1991 ALX policy by paying approximately $76 in overdue and current premiums. She stated that she would not have paid for the $1,000 face-value ALX policy had she known that Walton included an $8.80 premium in her monthly premium amount.
To prove a pattern and practice by Liberty National, White stated that, in addition to the Liberty National policies she had purchased insuring her own life and her brother's life, she had purchased life insurance policies from Liberty National "home service" agents insuring the lives of her husband, son, daughter, niece, and nephew. She stated that she paid the premiums on the policies as long as the Liberty National "home service" agent collected the premiums from her at her home. White stopped paying the premiums when the Liberty National "home service" agent stopped coming to her home. She stated that her husband mails in the monthly premiums on the policies insuring her life and her husband's life. The record reveals that, while White had taken a total of 11 policies with Liberty National, only two of policies were still in effect at the time of trial. The record reveals also that the Liberty National "home service" agents servicing White's policies would collect the premiums for a period of six months to one year, then would stop collecting the premiums, and next would return to White a few months after a policy had lapsed and would sell her at least one new policy. The only difference in the pattern and practice for the 1991 ALX policy is that the premiums were collected for approximately two years before the agent stopped collecting the premiums.
Hubert L. Morrison, Jr., Liberty National's vice-president of marketing services, testified that he was in charge of "field training" of agents for many years. As part of his field-training responsibilities, he created materials used by district and sales managers of Liberty National to train the agents. He testified that under Liberty National's "charge back policy" an agent would not receive "production credit" for selling a "replacement policy." Morrison stated that he was unsure whether Walton would have received "production credit" for selling White the 1993 $2,500 face-value ALX policy. He admitted that Walton would have received "production credit" for the 1993 $1,000 face-value ALX policy.

*465 I. Fraudulent Suppression

Liberty National argues that White failed to prove the elements of fraudulent suppression because she "had in her possession both policies and correspondence sent to her by this defendant which disclosed and explained the very information which [she] alleges was suppressed from her, i.e., that the policy has a modified death benefit for the first three years after issuance." Brief of the Appellant, p. 13. "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." § 6-5-102, Ala.Code 1975. "The elements of a claim of fraudulent suppression are: (1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression." Ex parte Dial Kennels of Alabama, Inc., 771 So.2d 419, 421 (Ala.1999).
A "material fact" is a fact that will induce action or inaction by the complaining party. Bank of Red Bay v. King, 482 So.2d 274 (Ala.1985). "In this case, as in most suppression cases, whether the matter alleged to have been suppressed was a `material fact' is a question for the jury." Ex parte Dial Kennels of Alabama, Inc., 771 So.2d at 421. See also Liberty Nat'l Life Ins. Co. v. McAllister, 675 So.2d 1292 (Ala.1995), and Bank of Red Bay, supra. On the other hand, the court decides as a matter of law whether the plaintiffs version of the facts, if true, imposes on the defendant a duty to disclose the suppressed matter to the plaintiff; and, on the issue of duty, the jury decides only whether the plaintiffs version of the facts is true, if the plaintiffs version is disputed. State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1998). The existence of a duty to disclose depends on "`the relationship of the parties, the value of the particular facts suppressed, and the relative knowledge of each party.' Baker [v. Bennett, 603 So.2d 928, 935 (Ala. 1992).]" McAllister, 675 So.2d at 1296. "Where the defendant has superior knowledge of the suppressed fact and the defrauded party has been induced to take action that otherwise might not have been taken, the obligation to disclose is particularly compelling." Baker, 603 So.2d at 935.
The gravamen of White's fraudulent suppression claim was that Walton fraudulently suppressed the fact that White could have reinstated the 1991 ALX policy by paying approximately $76 in overdue and current premiums and the fact that the reinstated 1991 ALX policy would have provided full face-value benefits in 11 months, rather than the three years under the new ALX policy. White's testimony that Walton did not tell her that she could reinstate the 1991 ALX policy by paying approximately $76 is undisputed. Also undisputed is White's testimony that she reads at a fourth-grade level and that she did not understand the ALX policy language. Further, the evidence viewed in the light most favorable to White tends to show that, after "home service" agents of Liberty National learned that White would stop paying premiums when an agent stopped collecting the premiums from White at her home and that White would purchase a new policy, or new policies, whenever an agent would visit White a few months after a policy had lapsed, the agents exploited this pattern. Consequently, the evidence viewed in the light most favorable to White supports the conclusion that the "home service" agents of *466 Liberty National "churned" White's policies to earn "production credit." Thus, the evidence of the particular circumstances of this case, the relationship between White and Liberty National, the value of facts suppressed, and the difference in the levels of knowledge between White and Liberty National, is sufficient to support the legal conclusion that Walton, a Liberty National "home service" agent, owed a duty to disclose to White that she could reinstate the 1991 ALX policy by paying approximately $76 in overdue and current premiums and that the 1991 ALX policy would have provided the full face-value benefit in just 11 more months after reinstatement. Therefore, the trial court properly submitted the fraudulent suppression claim to the jury.

II. Damages
Neither before the Court of Civil Appeals nor before us does Liberty National argue that a failure to prove damages defeats White's claim on the question of liability. Liberty National argues only that the compensatory award was excessive and that the punitive award was excessive. Accordingly, we will examine each.

III. Compensatory Damages
White's evidence raises a fair inference that, but for Liberty National's fraudulent suppression, White would have reinstated the 1991 ALX policy and paid only the overdue premiums totaling $57.21, the monthly premium of $19.07 for the month of reinstatement, and the same monthly premiums thereafter but that, instead, because of the fraudulent suppression, she paid premiums totaling $28.99 per month on two new policies over the period from the issuance of the two policies until June or July 1996. The total she would have paid for the 1991 policy over this period would have been approximately $705.59; the total she did pay for the two new policies over this period was $1,072.63. The difference of $367.04 constitutes her pecuniary damage. She did not claim damage for mental anguish. Accordingly the compensatory award must be remitted to the pecuniary damage sum of $367.04.

IV. Punitive Damages
Punitive damages must be supported by clear and convincing evidence "that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." § 6-11-20(a), Ala.Code 1975. Section 6-11-20(b) defines the terms "fraud," "malice," "wantonness," and "oppression":
"(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
"(2) Malice. The intentional doing of a wrongful act without just cause or excuse, either:
"a. With an intent to injure the person or property of another person or entity, or
"b. Under such circumstances that the law will imply an evil intent.
"(3) Wantonness. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.
". . . .
"(5) Oppression. Subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."
"`Gross' is defined as inexcusable, flagrant, or shameful." Talent Tree Personnel Services, Inc. v. Fleenor, 703 So.2d 917, 924 (Ala.1997). Additionally, § 6-11-27(a), Ala.Code 1975, provides:

*467 "(a) A principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either: (i) knew or should have known of the unfitness of the agent, employee, or servant, and employed him or continued to employ him, or used his services without proper instruction with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master, except where the plaintiff knowingly participated with the agent, servant, or employee to commit fraud or wrongful conduct with full knowledge of the import of his act."
Liberty National's issuance of the two 1993 ALX policies within a short period of time after White allowed the 1991 ALX policy to lapse, and Liberty National's continued acceptance of premiums for the two new policies, constituted a ratification of Walton's fraud. Moreover, the greater premium revenues produced by the 1993 policies and the lesser risk to the insurer entailed by the 1993 policies benefited Liberty National itself. Therefore, White's proof meets the criteria for the imposition of punitive damages upon Liberty National.
While the trial judge entered a thorough and persuasive order to such effect and addressed all of the applicable factors in the order, and while the record does contain evidence which, viewed in the light most favorable to the verdict winner, supports an inference of aggravating circumstances, including the churning of policies addressed above, nonetheless, our remittitur of the pecuniary damages requires a further reassessment of the punitive damage award for excessiveness. We conclude that the punitive damage award should be remitted from $150,000 to $30,000. A $30,000 punitive award would be appropriate because of the aggravating circumstances and because of the complexity and difficulty of the litigation.
The judgment of the trial court is affirmed on the condition that White accept a remittitur of the compensatory damage award from $1,350 to $367.04 and a remittitur of the punitive damage award from $150,000 to $30,000 and that White file with this Court an acceptance of the remittiturs within 21 days of the date of our certificate of judgment; or, in the absence of an acceptance of such remittiturs, then the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
HOUSTON, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
*468 MOORE, C.J., concurs in part and dissents in part.
SEE, J., dissents.
MOORE, Chief Justice (concurring in part and dissenting in part).
Gertrude White was a lady with a fourth-grade literacy level and limited experience in business affairs. Liberty National regularly sent agents to Ms. White's home to sell Ms. White policies covering her life and that of her disabled brother. These policies provided for only "modified benefits," i.e., they paid the face amount of the policy during the first three years only if the insured died from accidental causes. Otherwise, for a death occurring during that period, Liberty National returned only the premiums already paid, plus 10%. Liberty National, after selling her a policy, sent agents to Ms. White's home each month for several months to collect the premiums. Liberty National's agents then, as a practice, suddenly stopped coming to Ms. White's house, Ms. White stopped paying premiums, and the policy lapsed.
After a few months, a different Liberty National agent would visit Ms. White and sell her the same coverage in a new policy. These Liberty National agents repeated this routine again and again. These agents never informed Ms. White that she could restore her old policy by paying the overdue premiums. Instead, they sold her new policiesthis practice increased their commissions, but kept the full benefits just beyond her financial horizon. This pattern and practice by Liberty National, a practice of "churning" life insurance policies, was unethical and tortious.
Ms. White sued Liberty National for fraudulent suppression, alleging that it had been unjustly enriched by this conduct. The jury found that Liberty National had, in fact, fraudulently suppressed material information on one such series of transactions. The jury awarded $1,350 in compensatory damages and $200,000 in punitive damages. The trial court ordered a remittitur of the punitive damages to $150,000. The Court of Civil Appeals affirmed the trial court's judgment based on that remittitur.
I am unwilling to agree to a second remittitur, because the trial court was in the best position to observe the presentation of all of the evidence, particularly the testimony of all of the witnesses. In the absence of persuasive evidence indicating that the trial court's judgment was clearly erroneous, palpably wrong, or unjust, I am unwilling to impose a different result. I prefer to defer to the trial court.
I concur in Justice Johnstone's opinion, except to the extent that it orders a further remittitur of the punitive-damages award. I dissent from the imposition of that second remittitur.
SEE, Justice (dissenting).
I respectfully dissent from the main opinion's conclusion that White proved the elements of fraudulent suppression.[1] I agree, instead, with Judge Crawley's dissent.[2]
*469 As the main opinion of this Court notes, "[t]he obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." (Quoting § 6-5-102, Ala. Code 1975.) See also § 6-5-103 and § 6-5-104, Ala.Code 1975. In determining whether a defendant had a duty to disclose, this Court must consider a number of factors, including:
"(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact [alleged to have been suppressed]; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances."
State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 842-43 (Ala.1998). White argues that because she is "only" a high-school graduate, and because of her prior business dealings with Liberty National, Liberty National owed a duty of disclosure. Those facts alone are insufficient, as a matter of law, to create a duty to disclose. This Court has consistently held that where both parties to a transaction are knowledgeable, are capable of protecting their own interests, and are dealing at arms's length, there is no duty to disclose particular information unless the information is actually requested. Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238 (Ala.1992); Norman v. Amoco Oil Co., 558 So.2d 903 (Ala.1990); Duke v. Jones, 514 So.2d 981 (Ala.1987); Trio Broadcasters, Inc. v. Ward, 495 So.2d 621 (Ala.1986); Bank of Red Bay v. King, 482 So.2d 274 (Ala.1985). I do not believe the prior dealings between White and Liberty National indicate that this was not an arm's-length transaction. In addition, I do not believe that because White had "only" a high school diploma, she was incapable of protecting her own interests.
Moreover, as the Court of Civil Appeals has stated:
"If one receives from a defendant documents that put [her] on notice of the very facts alleged to have been suppressed, then that defendant cannot have suppressed those facts. See, e.g., Robinson v. JMIC Life Ins. Co., 697 So.2d 461 (Ala.1997); Henson v. Celtic Life Ins. Co., 621 So.2d 1268 (Ala.1993); Hardy v. Blue Cross & Blue Shield, 585 So.2d 29 (Ala.1991); Tillery v. Security Pacific Financial Services, Inc., 703 So.2d 402 (Ala.Civ.App.1997)."
Richardson v. Liberty Nat'l Life Ins. Co., 750 So.2d 575, 578 (Ala.Civ.App.1999). White testified that she had had the policies in her possession but that she had never read them. The policies contain the information White alleges Liberty National suppressed. Therefore, Liberty National did not suppress a material fact regarding the reduced-death-benefit policy.
Thus, I believe White did not have a valid fraudulent-suppression claim.[3]
NOTES
[*] Note from the reporter of decisions: On June 1, 2001, the Supreme Court issued a "certificate of judgment of reversal" reading as follows:

"WHEREAS, in keeping with the former order and judgment of this Court entered on April 13, 2001, and the appellee, Gertrude White, having informed this Court by letter of May 7, 2001, of her refusal to accept the remittiturs as set out in this Court's opinion and within the time required by this Court, IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the court below be reversed and annulled and this cause is remanded to the court below for a new trial.
"IT IS FURTHER ORDERED that the costs of appeal be taxed against the appellee as provided by Rule 35. Alabama Rules of Appellate Procedure."
[1] The main opinion does not address the question whether White relied on the alleged fraudulent suppression because, the main opinion concludes, Liberty National did not raise that issue on appeal. I disagree. Liberty National argued to the Court of Civil Appeals that White had failed to establish a prima facie case of fraudulent suppression. Thus, it argued by implication that she did not prove all the elements of her claim, including reliance.
[2] Judge Crawley, joined by Judge Thompson, dissented from the Court of Civil Appeals' main opinion. He "conclude[d] that the trial court erred by submitting the fraudulent-suppression claim regarding the reduced-deathbenefit policy to the jury." See Liberty Nat'l Life Ins. Co. v. White, 797 So.2d 452, 457 (Ala.Civ.App.1999). He also concluded "that Liberty National, as a matter of law, did not owe a duty to disclose how she could reinstate her original policy." 797 So.2d at 457.
[3] Because I believe the trial court erred in submitting the fraudulent-suppression claim to the jury, and because that was the only claim sent to the jury, I do not address the issue of damages.